CALIFORNIA ET AL. *v.* CABAZON BAND OF MISSION
INDIANS ET AL.

No. 85–1708.   Argued December 9, 1986—Decided February 25, 1987

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 222.

*Roderick E. Walston*, Supervising Deputy Attorney General of California, argued the cause for appellants. With him on the briefs were *John K. Van de Kamp*, Attorney General,

*Steve White*, Chief Assistant Attorney General, *Frederick R. Millar, Jr.*, Supervising Deputy Attorney General, *Rudolph Corona, Jr.*, Deputy Attorney General, *Gerald J. Geerlings, Peter H. Lyons*, and *Glenn R. Salter*.

*Glenn M. Feldman* argued the cause for appellees. With him on the brief were *Barbara A. Karshmer* and *George Forman*.*

JUSTICE WHITE delivered the opinion of the Court.

The Cabazon and Morongo Bands of Mission Indians, federally recognized Indian Tribes, occupy reservations in Riverside County, California.[1]   Each Band, pursuant to an

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Robert K. Corbin*, Attorney General of Arizona, *Anthony B. Ching*, Solicitor General, *Ian A. Macpherson, Brian McKay*, Attorney General of Nevada, and *Paul Bardacke*, Attorney General of New Mexico; and for the State of Washington et al. by *Kenneth O. Eikenberry*, Attorney General of Washington, *Timothy R. Malone*, Assistant Attorney General, *Bronson C. La Follette*, Attorney General of Wisconsin, and *John J. Kelly*, Chief State's Attorney of Connecticut.

Briefs of *amici curiae* urging affirmance were filed for the Chehalis Indian Tribe et al. by *Henry J. Sockbeson* and *Stephen V. Quesenberry;* for the Jicarilla Apache Tribe et al. by *Alan R. Taradash;* for the Oneida Indian Nation of New York by *William W. Taylor III* and *Christine Nicholson;* for the Pueblo of Sandia et al. by *L. Lamar Parrish, Theodore W. Barudin, Michael D. Bustamante*, and *Scott E. Borg;* for the San Manuel Band of Mission Indians by *Jerome L. Levine* and *David A. Lash;* and for the Seminole Tribe of Florida et al. by *Bruce S. Rogow.*

Briefs of *amici curiae* were filed for the State of Minnesota by *Hubert H. Humphrey III*, Attorney General, and *James M. Schoessler*, Assistant Attorney General; for the Pueblo of Laguna et al. by *W. Richard West, Jr., Thomas W. Fredericks, Rodney B. Lewis, Carol L. Barbero, John Bell, Rodney J. Edwards*, and *Art Bunce;* and for the Tulalip Tribes of Washington et al. by *Allen H. Sanders.*

[1] The Cabazon Reservation was originally set apart for the "permanent use and occupancy" of the Cabazon Indians by Executive Order of May 15, 1876.   The Morongo Reservation also was first established by Executive Order.   In 1891, in the Mission Indian Relief Act, 26 Stat. 712, Congress declared reservations "for the sole use and benefit" of the Cabazon and Morongo Bands.   The United States holds the land in trust for the Tribes.

ordinance approved by the Secretary of the Interior, conducts bingo games on its reservation.[2]  The Cabazon Band has also opened a card club at which draw poker and other card games are played.  The games are open to the public and are played predominantly by non-Indians coming onto the reservations.  The games are a major source of employment for tribal members, and the profits are the Tribes' sole source of income.  The State of California seeks to apply to the two Tribes Cal. Penal Code Ann. § 326.5 (West Supp. 1987).  That statute does not entirely prohibit the playing of bingo but permits it when the games are operated and staffed by members of designated charitable organizations who may not be paid for their services.  Profits must be kept in special accounts and used only for charitable purposes; prizes may not exceed $250 per game.  Asserting that the bingo games on the two reservations violated each of these restrictions, California insisted that the Tribes comply with state law.[3]  Riverside

---

The governing bodies of both Tribes have been recognized by the Secretary of the Interior.  The Cabazon Band has 25 enrolled members and the Morongo Band has approximately 730 enrolled members.

[2] The Cabazon ordinance authorizes the Band to sponsor bingo games within the reservation "[i]n order to promote economic development of the Cabazon Indian Reservation and to generate tribal revenues" and provides that net revenues from the games shall be kept in a separate fund to be used "for the purpose of promoting the health, education, welfare and well being of the Cabazon Indian Reservation and for other tribal purposes." App. to Brief for Appellees 1b–3b.  The ordinance further provides that no one other than the Band is authorized to sponsor a bingo game within the reservation, and that the games shall be open to the public, except that no one under 18 years old may play.  The Morongo ordinance similarly authorizes the establishment of a tribal bingo enterprise and dedicates revenues to programs to promote the health, education, and general welfare of tribal members.  Id., at 1a–6a.  It additionally provides that the games may be conducted at any time but must be conducted at least three days per week, that there shall be no prize limit for any single game or session, that no person under 18 years old shall be allowed to play, and that all employees shall wear identification.

[3] The Tribes admit that their games violate the provision governing staffing and the provision setting a limit on jackpots.  They dispute the

County also sought to apply its local Ordinance No. 558, regulating bingo, as well as its Ordinance No. 331, prohibiting the playing of draw poker and the other card games.

The Tribes sued the county in Federal District Court seeking a declaratory judgment that the county had no authority to apply its ordinances inside the reservations and an injunction against their enforcement. The State intervened, the facts were stipulated, and the District Court granted the Tribes' motion for summary judgment, holding that neither the State nor the county had any authority to enforce its gambling laws within the reservations. The Court of Appeals for the Ninth Circuit affirmed, 783 F. 2d 900 (1986), the State and the county appealed, and we postponed jurisdiction to the hearing on the merits. 476 U. S. 1168.[4]

State's assertion that they do not maintain separate funds for the bingo operations. At oral argument, counsel for the State asserted, contrary to the position taken in the merits brief and contrary to the stipulated facts in this case, App. 65, ¶ 24, 82–83, ¶ 15, that the Tribes are among the charitable organizations authorized to sponsor bingo games under the statute. It is therefore unclear whether the State intends to put the tribal bingo enterprises out of business or only to impose on them the staffing, jackpot limit, and separate fund requirements. The tribal bingo enterprises are apparently consistent with other provisions of the statute: minors are not allowed to participate, the games are conducted in buildings owned by the Tribes on tribal property, the games are open to the public, and persons must be physically present to participate.

[4] The Court of Appeals "affirm[ed] the summary judgment and the permanent injunction restraining the County and the State from applying their gambling laws on the reservations." 783 F. 2d, at 906. The judgment of the District Court declared that the state statute and county ordinance were of no force and effect within the two reservations, that the State and the county were without jurisdiction to enforce them, and that they were therefore enjoined from doing so. Since it is now sufficiently clear that the state and county laws at issue were held, as applied to the gambling activities on the two reservations, to be "invalid as repugnant to the Constitution, treaties or laws of the United States" within the meaning of 28 U. S. C. § 1254(2), the case is within our appellate jurisdiction.

I

The Court has consistently recognized that Indian tribes retain "attributes of sovereignty over both their members and their territory," *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975), and that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States," *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 154 (1980). It is clear, however, that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided. Here, the State insists that Congress has twice given its express consent: first in Pub. L. 280 in 1953, 67 Stat. 588, as amended, 18 U. S. C. § 1162, 28 U. S. C. § 1360 (1982 ed. and Supp. III), and second in the Organized Crime Control Act in 1970, 84 Stat. 937, 18 U. S. C. § 1955. We disagree in both respects.

In Pub. L. 280, Congress expressly granted six States, including California, jurisdiction over specified areas of Indian country[5] within the States and provided for the assumption of jurisdiction by other States. In § 2, California was granted broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State.[6] Section 4's grant of civil jurisdiction was more lim-

---

[5] "Indian country," as defined at 18 U. S. C. § 1151, includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." This definition applies to questions of both criminal and civil jurisdiction. *DeCoteau* v. *District County Court*, 420 U. S. 425, 427, n. 2 (1975). The Cabazon and Morongo Reservations are thus Indian country.

[6] Section 2(a), codified at 18 U. S. C. § 1162(a), provides:

"Each of the States . . . listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over offenses committed elsewhere within the State . . . , and the criminal

ited.[7]   In *Bryan* v. *Itasca County*, 426 U. S. 373 (1976), we interpreted § 4 to grant States jurisdiction over private civil litigation involving reservation Indians in state court, but not to grant general civil regulatory authority.   *Id.*, at 385, 388–390.   We held, therefore, that Minnesota could not apply its personal property tax within the reservation.   Congress' primary concern in enacting Pub. L. 280 was combating lawlessness on reservations.   *Id.*, at 379–380.   The Act plainly was not intended to effect total assimilation of Indian tribes into mainstream American society.   *Id.*, at 387.   We recognized that a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values.   Accordingly, when a State seeks to enforce a law within an Indian reservation under the authority of Pub. L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under § 2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.

The Minnesota personal property tax at issue in *Bryan* was unquestionably civil in nature.   The California bingo statute is not so easily categorized.   California law permits bingo

---

laws of such State . . . shall have the same force and effect within such Indian country as they have elsewhere within the State . . . :

.                     .                  .                          .

"California ................................. All Indian country within the State."

[7] Section 4(a), codified at 28 U. S. C. § 1360(a) (1982 ed. and Supp. III) provides:

"Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed . . . to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

.                     .                  .                          .                  .

"California ................................. All Indian country within the State."

games to be conducted only by charitable and other specified organizations, and then only by their members who may not receive any wage or profit for doing so; prizes are limited and receipts are to be segregated and used only for charitable purposes. Violation of any of these provisions is a misdemeanor. California insists that these are criminal laws which Pub. L. 280 permits it to enforce on the reservations.

Following its earlier decision in *Barona Group of Capitan Grande Band of Mission Indians, San Diego County, Cal.* v. *Duffy*, 694 F. 2d 1185 (1982), cert. denied, 461 U. S. 929 (1983), which also involved the applicability of § 326.5 of the California Penal Code to Indian reservations, the Court of Appeals rejected this submission. 783 F. 2d, at 901–903. In *Barona*, applying what it thought to be the civil/criminal dichotomy drawn in *Bryan* v. *Itasca County*, the Court of Appeals drew a distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws: if the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy. Inquiring into the nature of § 326.5, the Court of Appeals held that it was regulatory rather than prohibitory.[8] This was the analysis employed, with similar results,

---

[8] The Court of Appeals questioned whether we indicated disapproval of the prohibitory/regulatory distinction in *Rice* v. *Rehner*, 463 U. S. 713 (1983). We did not. We rejected in that case an asserted distinction between state "substantive" law and state "regulatory" law in the context of 18 U. S. C. § 1161, which provides that certain federal statutory provisions prohibiting the sale and possession of liquor within Indian country do not apply "provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country . . . ." We noted that nothing in the text or legislative history of

by the Court of Appeals for the Fifth Circuit in *Seminole Tribe of Florida* v. *Butterworth*, 658 F. 2d 310 (1981), cert. denied, 455 U. S. 1020 (1982), which the Ninth Circuit found persuasive.[9]

We are persuaded that the prohibitory/regulatory distinction is consistent with *Bryan*'s construction of Pub. L. 280. It is not a bright-line rule, however; and as the Ninth Circuit itself observed, an argument of some weight may be made that the bingo statute is prohibitory rather than regulatory. But in the present case, the court reexamined the state law and reaffirmed its holding in *Barona*, and we are reluctant to disagree with that court's view of the nature and intent of the state law at issue here.

There is surely a fair basis for its conclusion. California does not prohibit all forms of gambling. California itself operates a state lottery, Cal. Govt. Code Ann. § 8880 *et seq.* (West Supp. 1987), and daily encourages its citizens to participate in this state-run gambling. California also permits parimutuel horse-race betting. Cal. Bus. & Prof. Code Ann. §§ 19400–19667 (West 1964 and Supp. 1987). Although certain enumerated gambling games are prohibited under Cal. Penal Code Ann. § 330 (West Supp. 1987), games not enumerated, including the card games played in the Cabazon card club, are permissible. The Tribes assert that more than 400 card rooms similar to the Cabazon card club flourish in California, and the State does not dispute this fact. Brief for

---

§ 1161 supported the asserted distinction, and then contrasted that statute with Pub. L. 280. "In the absence of a context that might possibly require it, we are reluctant to make such a distinction. Cf. *Bryan* v. *Itasca County*, 426 U. S. 373, 390 (1976) (grant of civil jurisdiction in 28 U. S. C. § 1360 does not include regulatory jurisdiction to tax in light of tradition of immunity from taxation)." 463 U. S., at 734, n. 18.

[9] *Seminole Tribe* v. *Butterworth* was an action by the Seminole Tribe for a declaratory judgment that the Florida bingo statute did not apply to its operation of a bingo hall on its reservation. See also *Mashantucket Pequot Tribe* v. *McGuigan*, 626 F. Supp. 245 (Conn. 1986); *Oneida Tribe of Indians of Wisconsin* v. *Wisconsin*, 518 F. Supp. 712 (WD Wis. 1981).

Appellees 47–48.   Also, as the Court of Appeals noted, bingo is legally sponsored by many different organizations and is widely played in California.   There is no effort to forbid the playing of bingo by any member of the public over the age of 18.   Indeed, the permitted bingo games *must* be open to the general public.   Nor is there any limit on the number of games which eligible organizations may operate, the receipts which they may obtain from the games, the number of games which a participant may play, or the amount of money which a participant may spend, either per game or in total.   In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular.[10]

California argues, however, that high stakes, *unregulated* bingo, the conduct which attracts organized crime, is a misdemeanor in California and may be prohibited on Indian reservations.   But that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub. L. 280.   Otherwise, the distinction between § 2 and § 4 of that law could easily be avoided and total assimilation permitted.

---

[10] Nothing in this opinion suggests that cockfighting, tattoo parlors, nude dancing, and prostitution are permissible on Indian reservations within California.   See *post*, at 222.   The applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory.   The lower courts have not demonstrated an inability to identify prohibitory laws.   For example, in *United States* v. *Marcyes*, 557 F. 2d 1361, 1363–1365 (CA9 1977), the Court of Appeals adopted and applied the prohibitory/regulatory distinction in determining whether a state law governing the possession of fireworks was made applicable to Indian reservations by the Assimilative Crimes Statute, 62 Stat. 686, 18 U. S. C. § 13.   The court concluded that, despite limited exceptions to the statute's prohibition, the fireworks law was prohibitory in nature.   See also *United States* v. *Farris*, 624 F. 2d 890 (CA9 1980), cert. denied, 449 U. S. 1111 (1981), discussed in n. 13, *infra*.

This view, adopted here and by the Fifth Circuit in the *Butterworth* case, we find persuasive. Accordingly, we conclude that Pub. L. 280 does not authorize California to enforce Cal. Penal Code Ann. § 326.5 (West Supp. 1987) within the Cabazon and Morongo Reservations.[11]

California and Riverside County also argue that the Organized Crime Control Act (OCCA) authorizes the application of their gambling laws to the tribal bingo enterprises. The OCCA makes certain violations of state and local gambling laws violations of federal law.[12] The Court of Appeals re-

---

[11] Nor does Pub. L. 280 authorize the county to apply its gambling ordinances to the reservations. We note initially that it is doubtful that Pub. L. 280 authorizes the application of any local laws to Indian reservations. Section 2 of Pub. L. 280 provides that the criminal laws of the "State" shall have the same force and effect within Indian country as they have elsewhere. This language seems clearly to exclude local laws. We need not decide this issue, however, because even if Pub. L. 280 does make local criminal/prohibitory laws applicable on Indian reservations, the ordinances in question here do not apply. Consistent with our analysis of Cal. Penal Code Ann. § 326.5 (West Supp. 1987) above, we conclude that Ordinance No. 558, the bingo ordinance, is regulatory in nature. Although Ordinance No. 331 prohibits gambling on all card games, including the games played in the Cabazon card club, the county does not prohibit municipalities within the county from enacting municipal ordinances permitting these card games, and two municipalities have in fact done so. It is clear, therefore, that Ordinance No. 331 does not prohibit these card games for purposes of Pub. L. 280.

[12] OCCA, 18 U. S. C. § 1955, provides in pertinent part:

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more that $20,000 or imprisoned not more than five years, or both.

"(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which —

"(i) is a *violation of the law of a State or political subdivision* in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." (Emphasis added.)

jected appellants' argument, relying on its earlier decisions in *United States* v. *Farris*, 624 F. 2d 890 (CA9 1980), cert. denied, 449 U. S. 1111 (1981), and *Barona Group of Capitan Grande Band of Mission Indians, San Diego County, Cal.* v. *Duffy*, 694 F. 2d 1185 (1982). 783 F. 2d, at 903. The court explained that whether a tribal activity is "a violation of the law of a state" within the meaning of OCCA depends on whether it violates the "public policy" of the State, the same test for application of state law under Pub. L. 280, and similarly concluded that bingo is not contrary to the public policy of California.[13]

The Court of Appeals for the Sixth Circuit has rejected this view. *United States* v. *Dakota*, 796 F. 2d 186 (1986).[14] Since the OCCA standard is simply whether the gambling business is being operated in "violation of the law of a State," there is no basis for the regulatory/prohibitory distinction that it agreed is suitable in construing and applying Pub. L. 280. 796 F. 2d, at 188. And because enforcement of OCCA is an exercise of federal rather than state authority, there is no danger of state encroachment on Indian tribal sovereignty. *Ibid.* This latter observation exposes the flaw in appellants' reliance on OCCA. That enactment is indeed a federal law that, among other things, defines certain federal crimes over which the district courts have exclusive jurisdiction.[15] There is nothing in OCCA indicating that the States

---

[13] In *Farris*, in contrast, the court had concluded that a gambling business, featuring blackjack, poker, and dice, operated by tribal members on the Puyallup Reservation violated the public policy of Washington; the United States, therefore, could enforce OCCA against the Indians.

[14] In *Dakota*, the United States sought a declaratory judgment that a gambling business, also featuring the playing of blackjack, poker, and dice, operated by two members of the Keweenaw Bay Indian Community on land controlled by the community, and under a license issued by the community, violated OCCA. The Court of Appeals held that the gambling business violated Michigan law and OCCA.

[15] Title 18 U. S. C. § 3231 provides: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."

are to have any part in enforcing federal criminal laws or are authorized to make arrests on Indian reservations that in the absence of OCCA they could not effect. We are not informed of any federal efforts to employ OCCA to prosecute the playing of bingo on Indian reservations, although there are more than 100 such enterprises currently in operation, many of which have been in existence for several years, for the most part with the encouragement of the Federal Government.[16] Whether or not, then, the Sixth Circuit is right and the Ninth Circuit wrong about the coverage of OCCA, a matter that we do not decide, there is no warrant for California to make arrests on reservations and thus, through OCCA, enforce its gambling laws against Indian tribes.

## II

Because the state and county laws at issue here are imposed directly on the Tribes that operate the games, and are not expressly permitted by Congress, the Tribes argue that the judgment below should be affirmed without more. They rely on the statement in *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 170–171 (1973), that "'[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply'" (quoting United States Dept. of the Interior, Federal Indian Law 845 (1958)). Our cases, however, have not established an inflexible *per se* rule pre-

---

[16] See S. Rep. No. 99–493, p. 2 (1986). Federal law enforcement officers have the capability to respond to violations of OCCA on Indian reservations, as is apparent from *Farris* and *Dakota*. This is not a situation where the unavailability of a federal officer at a particular moment would likely result in nonenforcement. OCCA is directed at large-scale gambling enterprises. If state officers discover a gambling business unknown to federal authorities while performing their duties authorized by Pub. L. 280, there should be ample time for them to inform federal authorities, who would then determine whether investigation or other enforcement action was appropriate. A federal police officer is assigned by the Department of the Interior to patrol the Indian reservations in southern California. App. to Brief for Appellees D–1—D–7.

cluding state jurisdiction over tribes and tribal members in the absence of express congressional consent.[17]  "[U]nder certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and . . . in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 331–332 (1983) (footnotes omitted). Both *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463 (1976), and *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134 (1980), are illustrative.  In those decisions we held that, in the absence of express congressional permission, a State could require tribal smokeshops on Indian reservations to collect state sales tax from their non-Indian

---

[17] In the special area of state taxation of Indian tribes and tribal members, we have adopted a *per se* rule.  In *Montana* v. *Blackfeet Tribe*, 471 U. S. 759 (1985), we held that Montana could not tax the Tribe's royalty interests in oil and gas leases issued to non-Indian lessees under the Indian Mineral Leasing Act of 1938.  We stated: "In keeping with its plenary authority over Indian affairs, Congress can authorize the imposition of state taxes on Indian tribes and individual Indians.  It has not done so often, and the Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear." *Id.*, at 765.  We have repeatedly addressed the issue of state taxation of tribes and tribal members and the state, federal, and tribal interests which it implicates.  We have recognized that the federal tradition of Indian immunity from state taxation is very strong and that the state interest in taxation is correspondingly weak.  Accordingly, it is unnecessary to rebalance these interests in every case.  In *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148 (1973), we distinguished state taxation from other assertions of state jurisdiction.  We acknowledged that we had made repeated statements "to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law. . . . Even so, *in the special area of state taxation*, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan* v. *Arizona State Tax Comm'n*, [411 U. S. 164

customers.   Both cases involved nonmembers entering and
purchasing tobacco products on the reservations involved.
The State's interest in assuring the collection of sales taxes
from non-Indians enjoying the off-reservation services of the
State was sufficient to warrant the minimal burden imposed
on the tribal smokeshop operators.[18]

This case also involves a state burden on tribal Indians in
the context of their dealings with non-Indians since the ques-
tion is whether the State may prevent the Tribes from mak-
ing available high stakes bingo games to non-Indians coming
from outside the reservations.   Decision in this case turns on
whether state authority is pre-empted by the operation of
federal law; and "[s]tate jurisdiction is pre-empted . . . if it
interferes or is incompatible with federal and tribal interests
reflected in federal law, unless the state interests at stake
are sufficient to justify the assertion of state authority."
*Mescalero*, 462 U. S., at 333, 334.   The inquiry is to pro-
ceed in light of traditional notions of Indian sovereignty and
the congressional goal of Indian self-government, including
its "overriding goal" of encouraging tribal self-sufficiency
and economic development.   *Id.*, at 334–335.[19]   See also,

---

(1973)], lays to rest any doubt in this respect by holding that such taxation
is not permissible absent congressional consent."   *Ibid.* (emphasis added).

[18] JUSTICE STEVENS appears to embrace the opposite presumption—that
state laws apply on Indian reservations absent an express congressional
statement to the contrary.   But, as we stated in *White Mountain Apache
Tribe* v. *Bracker*, 448 U. S. 136, 151 (1980), in the context of an assertion of
state authority over the activities of non-Indians within a reservation,
"[t]hat is simply not the law."   It is even less correct when applied to the
activities of tribes and tribal members within reservations.

[19] In *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S., at 335, n. 17,
we discussed a number of the statutes Congress enacted to promote tribal
self-government.   The congressional declarations of policy in the Indian
Financing Act of 1974, as amended, 25 U. S. C. § 1451 *et seq.* (1982 ed. and
Supp. III), and in the Indian Self-Determination and Education Assistance
Act of 1975, as amended, 25 U. S. C. § 450 *et seq.* (1982 ed. and Supp. III),
are particularly significant in this case: "It is hereby declared to be the pol-
icy of Congress . . . to help develop and utilize Indian resources, both phys-
ical and human, to a point where the Indians will fully exercise responsibil-

*Iowa Mutual Insurance Co.* v. *LaPlante, ante,* p. 9; *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136, 143 (1980).

These are important federal interests. They were reaffirmed by the President's 1983 Statement on Indian Policy.[20] More specifically, the Department of the Interior, which has the primary responsibility for carrying out the Federal Government's trust obligations to Indian tribes, has sought to implement these policies by promoting tribal bingo enterprises.[21] Under the Indian Financing Act of 1974, 25

---

ity for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities." 25 U. S. C. § 1451. Similarly, "[t]he Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U. S. C. § 450a(b).

[20] "It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government." 19 Weekly Comp. of Pres. Doc. 99 (1983).

[21] The Court of Appeals relied on the following official declarations. 783 F. 2d, at 904–905. A policy directive issued by the Assistant Secretary of the Interior on March 2, 1983, stated that the Department would "strongly oppose" any proposed legislation that would subject tribes or tribal members to state gambling regulation. "Such a proposal is inconsistent with the President's Indian Policy Statement of January 24, 1983. . . . A number of tribes have begun to engage in bingo and similar gambling operations on their reservations for the very purpose enunciated in the. President's Message. Given the often limited resources which tribes have for revenue-producing activities, it is believed that this kind of revenue-producing possibility should be protected and enhanced." The court also relied on an affidavit submitted by the Director of Indian Services, Bureau of Indian Affairs, on behalf of the Tribes' position:

"It is the department's position that tribal bingo enterprises are an appropriate means by which tribes can further their economic self-sufficiency, the economic development of reservations and tribal self-

U. S. C. § 1451 *et seq.* (1982 ed. and Supp. III), the Secretary of the Interior has made grants and has guaranteed loans for the purpose of constructing bingo facilities.   See S. Rep. No. 99–493, p. 5 (1986); *Mashantucket Pequot Tribe* v. *McGuigan,* 626 F. Supp. 245, 246 (Conn. 1986).   The Department of Housing and Urban Development and the Department of Health and Human Services have also provided financial assistance to develop tribal gaming enterprises. See S. Rep. No. 99–493, *supra,* at 5.   Here, the Secretary of the Interior has approved tribal ordinances establishing and regulating the gaming activities involved.   See H. R. Rep. No. 99–488, p. 10 (1986).   The Secretary has also exercised his authority to review tribal bingo management contracts under 25 U. S. C. § 81, and has issued detailed guidelines governing that review.[22]   App. to Motion to Dismiss Appeal or Affirm Judgment 63a–70a.

These policies and actions, which demonstrate the Government's approval and active promotion of tribal bingo enterprises, are of particular relevance in this case.   The Cabazon and Morongo Reservations contain no natural resources which can be exploited.   The tribal games at present provide the sole source of revenues for the operation of the tribal gov-

---

determination.   All of these are federal goals for the tribes.   Furthermore, it is the Department's position that the development of tribal bingo enterprises is consistent with and in furtherance of President Reagan's Indian Policy Statement of January 24, 1983."

[22] Among other things, the guidelines require that the contract state that no payments have been made or will be made to any elected member of the tribal government or relative of such member for the purpose of obtaining or maintaining the contract.   The contractor is required to disclose information on all parties in interest to the contract and all employees who will have day-to-day management responsibility for the gambling operation, including names, home and business addresses, occupations, dates of birth, and Social Security numbers.   The Federal Bureau of Investigation must conduct a name-and-record check on these persons before a contract may be approved.   The guidelines also specify accounting procedures and cash management procedures which the contractor must follow.

ernments and the provision of tribal services. They are also the major sources of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members. The Tribes' interests obviously parallel the federal interests.

California seeks to diminish the weight of these seemingly important tribal interests by asserting that the Tribes are merely marketing an exemption from state gambling laws. In *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S., at 155, we held that the State could tax cigarettes sold by tribal smokeshops to non-Indians, even though it would eliminate their competitive advantage and substantially reduce revenues used to provide tribal services, because the Tribes had no right "to market an exemption from state taxation to persons who would normally do their business elsewhere." We stated that "[i]t is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." *Ibid.* Here, however, the Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians. They have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide. The Tribes have a strong incentive to provide comfortable, clean, and attractive facilities and well-run games in order to increase attendance at the games.[23] The tribal bingo enterprises are

---

[23] An agent of the California Bureau of Investigation visited the Cabazon bingo parlor as part of an investigation of tribal bingo enterprises. The agent described the clientele as follows:

"In attendance for the Monday evening bingo session were about 300 players. . . . On row 5, on the front left side were a middle-aged latin couple, who were later joined by two young latin males. These men had to have

similar to the resort complex, featuring hunting and fishing, that the Mescalero Apache Tribe operates on its reservation through the "concerted and sustained" management of reservation land and wildlife resources. *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S., at 341. The Mescalero project generates funds for essential tribal services and provides employment for tribal members. We there rejected the notion that the Tribe is merely marketing an exemption from state hunting and fishing regulations and concluded that New Mexico could not regulate on-reservation fishing and hunting by non-Indians. *Ibid.* Similarly, the Cabazon and Morongo Bands are generating value on the reservations through activities in which they have a substantial interest.

The State also relies on *Rice* v. *Rehner*, 463 U. S. 713 (1983), in which we held that California could require a tribal member and a federally licensed Indian trader operating a general store on a reservation to obtain a state license in order to sell liquor for off-premises consumption. But our decision there rested on the grounds that Congress had never recognized any sovereign tribal interest in regulating liquor traffic and that Congress, historically, had plainly anticipated that the States would exercise concurrent authority to regulate the use and distribution of liquor on Indian reservations. There is no such traditional federal view governing the outcome of this case, since, as we have explained, the current federal policy is to promote precisely what California seeks to prevent.

The sole interest asserted by the State to justify the imposition of its bingo laws on the Tribes is in preventing the infiltration of the tribal games by organized crime. To the extent that the State seeks to prevent any and all bingo

---

the game explained to them. The middle table was shared with a senior citizen couple. The aisle table had 2 elderly women, 1 in a wheelchair, and a middle-aged woman. . . . A goodly portion of the crowd were retired age to senior citizens." App. 176. We are unwilling to assume that these patrons would be indifferent to the services offered by the Tribes.

games from being played on tribal lands while permitting regulated, off-reservation games, this asserted interest is irrelevant and the state and county laws are pre-empted. See n. 3, *supra*. Even to the extent that the State and county seek to regulate short of prohibition, the laws are pre-empted. The State insists that the high stakes offered at tribal games are attractive to organized crime, whereas the controlled games authorized under California law are not. This is surely a legitimate concern, but we are unconvinced that it is sufficient to escape the pre-emptive force of federal and tribal interests apparent in this case. California does not allege any present criminal involvement in the Cabazon and Morongo enterprises, and the Ninth Circuit discerned none. 783 F. 2d, at 904. An official of the Department of Justice has expressed some concern about tribal bingo operations,[24] but far from any action being taken evidencing this concern—and surely the Federal Government has the authority to forbid Indian gambling enterprises—the prevailing federal policy continues to support these tribal enterprises, including those of the Tribes involved in this case.[25]

We conclude that the State's interest in preventing the infiltration of the tribal bingo enterprises by organized crime does not justify state regulation of the tribal bingo enter-

---

[24] Hearings on H. R. 4566 before the House Committee on Interior and Insular Affairs, 98th Cong., 2d Sess., 15–39, 66–75 (1984); App. 197–205.

[25] JUSTICE STEVENS' assertion, *post*, at 226, that the State's interest in restricting the proceeds of gambling to itself, and the charities it favors, justifies the prohibition or regulation of tribal bingo games is indeed strange. The State asserted no such discriminatory economic interest; and it is pure speculation that, in the absence of tribal bingo games, would-be patrons would purchase lottery tickets or would attend state-approved bingo games instead. In any event, certainly California has no legitimate interest in allowing potential lottery dollars to be diverted to non-Indian owners of card clubs and horse tracks while denying Indian tribes the opportunity to profit from gambling activities. Nor is California necessarily entitled to prefer the funding needs of state-approved charities over the funding needs of the Tribes, who dedicate bingo revenues to promoting the health, education, and general welfare of tribal members.

prises in light of the compelling federal and tribal interests supporting them. State regulation would impermissibly infringe on tribal government, and this conclusion applies equally to the county's attempted regulation of the Cabazon card club. We therefore affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, dissenting.

Unless and until Congress exempts Indian-managed gambling from state law and subjects it to federal supervision, I believe that a State may enforce its laws prohibiting high-stakes gambling on Indian reservations within its borders. Congress has not pre-empted California's prohibition against high-stakes bingo games and the Secretary of the Interior plainly has no authority to do so. While gambling provides needed employment and income for Indian tribes, these benefits do not, in my opinion, justify tribal operation of currently unlawful commercial activities. Accepting the majority's reasoning would require exemptions for cockfighting, tattoo parlors, nude dancing, houses of prostitution, and other illegal but profitable enterprises. As the law now stands, I believe tribal entrepreneurs, like others who might derive profits from catering to non-Indian customers, must obey applicable state laws.

In my opinion the plain language of Pub. L. 280, 67 Stat. 588, as amended, 18 U. S. C. § 1162, 28 U. S. C. § 1360 (1982 ed. and Supp. III), authorizes California to enforce its prohibition against commercial gambling on Indian reservations. The State prohibits bingo games that are not operated by members of designated charitable organizations or which offer prizes in excess of $250 per game. Cal. Penal Code Ann. § 326.5 (West Supp. 1987). In § 2 of Pub. L. 280, Con-

gress expressly provided that the criminal laws of the State of California "shall have the same force and effect within such Indian country as they have elsewhere within the State." 18 U. S. C. § 1162(a). Moreover, it provided in § 4(a) that the civil laws of California "that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State." 28 U. S. C. § 1360(a) (1982 ed., Supp. III).

It is true that in *Bryan* v. *Itasca County*, 426 U. S. 373 (1976), we held that Pub. L. 280 did not confer civil jurisdiction on a State to impose a personal property tax on a mobile home that was owned by a reservation Indian and located within the reservation. Moreover, the reasoning of that decision recognizes the importance of preserving the traditional aspects of tribal sovereignty over the relationships among reservation Indians. Our more recent cases have made it clear, however, that commercial transactions between Indians and non-Indians—even when conducted on a reservation—do not enjoy any blanket immunity from state regulation. In *Rice* v. *Rehner*, 463 U. S. 713 (1983), respondent, a federally licensed Indian trader, was a tribal member operating a general store on an Indian reservation. We held that the State could require Rehner to obtain a state license to sell liquor for off-premises consumption. The Court attempts to distinguish *Rice* v. *Rehner* as resting on the absence of a sovereign tribal interest in the regulation of liquor traffic to the exclusion of the States. But as a necessary step on our way to deciding that the State could regulate all tribal liquor sales in Indian country, we recognized the State's authority over transactions, whether they be liquor sales or gambling, between Indians and non-Indians: "If there is any interest in tribal sovereignty implicated by imposition

of California's alcoholic beverage regulation, it exists only insofar as the State attempts to regulate Rehner's sale of liquor to other members of the Pala Tribe on the Pala Reservation." *Id.*, at 721.   Similarly, in *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134 (1980), we held that a State could impose its sales and cigarette taxes on non-Indian customers of smokeshops on Indian reservations.

Today the Court seems prepared to acknowledge that an Indian tribe's commercial transactions with non-Indians may violate "the State's public policy." *Ante,* at 209.   The Court reasons, however, that the operation of high-stakes bingo games does not run afoul of California's public policy because the State permits some forms of gambling and, specifically, some forms of bingo.   I find this approach to "public policy" curious, to say the least.   The State's policy concerning gambling is to authorize certain specific gambling activities that comply with carefully defined regulation and that provide revenues either for the State itself or for certain charitable purposes, and to prohibit all unregulated commercial lotteries that are operated for private profit.[1]   To argue that the tribal bingo games comply with the public policy of California because the State permits some other gambling is tantamount to arguing that driving over 60 miles an hour is con-

---

[1] The Court holds that Pub. L. 280 does not authorize California to enforce its prohibition against commercial gambling within the Cabazon and Morongo Reservations.   *Ante,* at 212.   The Court reaches this conclusion by determining that § 4(a) of Pub. L. 280, 28 U. S. C. § 1360(a), withholds from the States general civil regulatory authority over Indian tribes, and that the State's rules concerning gambling are regulatory rather than prohibitory.   In its opinion, the Court dismisses the State's argument that high-stakes, unregulated bingo is prohibited with the contention that an otherwise regulatory law does not become a prohibition simply because it "is enforceable by criminal as well as civil means." *Ante,* at 211.   Aside from the questionable merit of this proposition, it does not even address the meaning of § 2(a) of Pub. L. 280, 18 U. S. C. 1162(a) (1982 ed., Supp. III), a provision which is sufficient to control the disposition of this case. See *supra,* at 222.

sistent with public policy because the State allows driving at speeds of up to 55 miles an hour.

In my view, Congress has permitted the State to apply its prohibitions against commercial gambling to Indian tribes. Even if Congress had not done so, however, the State has the authority to assert jurisdiction over appellees' gambling activities. We recognized this authority in *Washington* v. *Confederated Tribes, supra;* the Court's attempt to distinguish the reasoning of our decision in that case is unpersuasive. In *Washington* v. *Confederated Tribes,* the Tribes contended that the State had no power to tax on-reservation sales of cigarettes to non-Indians. The argument that we rejected there has a familiar ring:

> "The Tribes contend that their involvement in the operation and taxation of cigarette marketing on the reservation ousts the State from any power to exact its sales and cigarette taxes from nonmembers purchasing cigarettes at tribal smokeshops. The primary argument is economic. It is asserted that smokeshop cigarette sales generate substantial revenues for the Tribes which they expend for essential governmental services, including programs to combat severe poverty and underdevelopment at the reservations. Most cigarette purchasers are outsiders attracted onto the reservations by the bargain prices the smokeshops charge by virtue of their claimed exemption from state taxation. If the State is permitted to impose its taxes, the Tribes will no longer enjoy any competitive advantage vis-à-vis businesses in surrounding areas." *Id.,* at 154.

> "What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation." *Id.,* at 155.

In *Confederated Tribes,* the tribal smokeshops offered their customers the same products, services, and facilities that other tobacconists offered to their customers. Al-

though the smokeshops were more modest than the bingo palaces involved in this case, presumably they were equally the product of tribal labor and tribal capital. What made them successful, however, was the value of the exemption that was offered to non-Indians "who would normally do their business elsewhere." *Id.*, at 155.

Similarly, it is painfully obvious that the value of the Tribe's asserted exemption from California's gambling laws is the primary attraction to customers who would normally do their gambling elsewhere. The Cabazon Band of Mission Indians has no tradition or special expertise in the operation of large bingo parlors. See Declaration of William J. Wallace, ¶2, App. 153, 171. Indeed, the entire membership of the Cabazon Tribe—it has only 25 enrolled members—is barely adequate to operate a bingo game that is patronized by hundreds of non-Indians nightly. How this small and formerly impoverished Band of Indians could have attracted the investment capital for its enterprise without benefit of the claimed exemption is certainly a mystery to me.

I am entirely unpersuaded by the Court's view that the State of California has no legitimate interest in requiring appellees' gambling business to comply with the same standards that the operators of other bingo games must observe. The State's interest is both economic and protective. Presumably the State has determined that its interest in generating revenues for the public fisc and for certain charities outweighs the benefits from a total prohibition against publicly sponsored games of chance. Whatever revenues the Tribes receive from their unregulated bingo games drain funds from the state-approved recipients of lottery revenues—just as the tax-free cigarette sales in the *Confederated Tribes* case diminished the receipts that the tax collector would otherwise have received.

Moreover, I am unwilling to dismiss as readily as the Court does the State's concern that these unregulated high-stakes bingo games may attract organized criminal infiltration.

Brief for Appellants 25–26, 29; Reply Brief for Appellants 12. Comprehensive regulation of the commercial gambling ventures that a State elects to license is obviously justified as a prophylactic measure even if there is presently no criminal activity associated with casino gambling in the State. Indeed, California regulates charitable bingo, horseracing, and its own lottery. The State of California requires that charitable bingo games may only be operated and staffed by members of designated charitable organizations, and that proceeds from the games may only be used for charitable purposes. Cal. Penal Code Ann. § 326.5 (West Supp. 1987). These requirements for staffing and for dispersal of profits provide bulwarks against criminal activity; neither safeguard exists for bingo games on Indian reservations.[2] In my judgment, unless Congress authorizes and regulates these commercial gambling ventures catering to non-Indians, the State has a legitimate law enforcement interest in proscribing them.

Appellants and the Secretary of the Interior may well be correct, in the abstract, that gambling facilities are a sensible way to generate revenues that are badly needed by reservation Indians. But the decision to adopt, to reject, or to define the precise contours of such a course of action, and thereby to set aside the substantial public policy concerns of a sovereign State, should be made by the Congress of the United States. It should not be made by this Court, by the temporary occupant of the Office of the Secretary of the Interior, or by non-Indian entrepreneurs who are experts in gambling management but not necessarily dedicated to serving the future well-being of Indian tribes.

I respectfully dissent.

---

[2] The Cabazon Band's bingo room was operated under a management agreement with an outside firm until 1986; the Morongo Band operates its bingo room under a similar management agreement. App. to Brief for Appellees, C–1 to C–3; Morongo Band of Mission Indians Tribal Bingo Enterprise Management Agreement, ¶ 4B, App. 97–98.