Smith, J.
(concurring in part and dissenting in part). I agree with the majority that the 1993 Compact violates the New York State Constitution in that the Legislature and not the Governor is given policymaking authority. In addition, because article I, § 9 of the New York State Constitution clearly forbids the gambling permitted by the 1993 Compact, I would reach that issue.[1]
As noted by the Court’s opinion, the New York State Consti *826 tution authorizes the Legislature and not the Governor to set policy. It reads: “The legislative power of this state shall be vested in the senate and the assembly” (NY Const, art III, § 1). “The executive power shall be vested in the governor * * *.” (NY Const, art IV, § 1.) “The governor shall communicate by message to the legislature at every session the condition of the state, and recommend such matters to it as he or she shall judge expedient. The governor shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed” (NY Const, art IV, § 3).
It is equally true, however, that the Constitution forbids gambling, except for limited exceptions, and prohibits commercialized gambling. It reads:
“[E]xcept as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section” (NY Const, art I, § 9 [1]).
Before the first New York State Constitution was written in 1777, gambling in New York was forbidden. Colonial Governor *827 Tryon was appointed by the King of England in February 1771.[2] He served as Governor until after the Revolution began, leaving office on March 23, 1780. The commission and instructions issued to Tryon upon his appointment prohibited gambling, referred to as “lotteries”:
“Whereas, a practice hath of late years prevailed in several of our colonies and plantations in America of passing laws for raising money by constituting public lotteries, and whereas, it hath been represented unto us that such practice doth tend to disengage those who become adventurers therein from that spirit of industry and attention to their proper callings and occupations on which the public welfare so greatly depends, and whereas, it further appears that this practice of authorizing lotteries by acts of legislature hath been also extended to the enabling private persons to set up such lotteries, by means whereof great frauds and abuses have been committed, it is therefore our will and pleasure that you do not give your assent to any act or acts for raising money by the institution of any public or private lotteries whatever until you shall have first transmitted unto us by one of our principal secretaries of state a draught or draughts of such act or acts, and shall have received our direction thereupon.”
The original Constitution of 1777 does not mention gambling or lotteries. Lotteries were again specifically prohibited in the second Constitution, approved in 1821. Article VII, § 11 provided: “No lottery shall hereafter be authorized in this state; and the legislature shall pass laws to prevent the sale of all lottery tickets within this state, except in lotteries already provided for by law.”
In the third Constitution, approved in 1846, article I, § 10 prohibited gambling in almost identical language to the previous Constitution: “nor shall any lottery hereafter be authorized, or any sale of lottery tickets allowed within this state.”
The fourth Constitution, approved in 1894, specifically prohibited gambling in article I, § 9. In addition to prohibiting lotteries and gambling in general, this section singled out pool-selling and bookmaking as well. It read: “nor shall any lottery or the sale of lottery tickets, pool-selling, book-making, or any *828 other kind of gambling hereafter be authorized or allowed within this State.”
In 1938 the fifth and current Constitution was approved. This Constitution maintained the general prohibition against gambling but did authorize a limited range of gambling. Article I, § 9 (1) provides:
“except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state.”
Article I, § 9 (2) provides:
“any city, town or village within the state may by an approving vote of the majority of the qualified electors * * * voting on a proposition * * * at a general or special election * * *, subject to state legislative supervision and control, * * * conduct * * * the following categories of games of chance * * * (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance.”
Subdivision (2) goes on to provide that “only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games.”
Additionally, subdivision (2) provides that “[t]he legislature shall pass appropriate laws to effectuate the purposes of this subdivision, [and] ensure that such games are rigidly regulated to prevent commercialized gambling” (emphasis added).
*829 Consistent with this latter provision, the Legislature has outlawed most forms of gambling (see Penal Law art 225). As noted in Donnino’s Practice Commentary to article 225, “With certain exceptions, gambling is prohibited by the New York State Constitution [article I, § 9].” (McKinney’s Cons Laws of NY, Book 39, at 195.)
The Indian Gaming Regulatory Act (25 USC § 2701 et seq.) does not require that gambling be imposed upon states where it is forbidden. 25 USC § 2701 (5) provides:
“Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity” (emphasis added).[3]
The Indian Gaming Regulatory Act defines three classes of gaming. Class I gaming means “social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations” (25 USC § 2703 [6]). Class II gaming is defined in 25 USC § 2703 (7) (A) which provides:
“The term ‘class II gaming’ means—
“(i) the game of chance commonly known as bingo
* * *
“(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
“(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
“(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including * * * pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and
*830 “(ii) card games that—
“(I) are explicitly authorized by the laws of the State, or
“(II) are not explicitly prohibited by the laws of the State and are played at any location in the State.”
The statute further defines what class II gaming does not include. 25 USC § 2703 (7) (B) provides:
“The term ‘class II gaming5 does not include—
“(i) any banking card games, including baccarat, chemin de fer, or blackjack (21), or
“(ii) electronic or electromechanical facsimiles of any game of chance or slot machines of any kind.”
The term class III gaming is defined in 25 USC § 2703 (8) and provides:
“The term ‘class III gaming5 means all forms of gaming that are not class I gaming or class II gaming.”
In violation of article I, § 9, the 1993 Compact authorizes class III commercial gaming. The preamble to the 1993 Compact, entitled “Tribal-State Compact Between the St. Regis Mohawk Tribe and the State of New York” refers to class III gaming and states “whereas, the St. Regis Mohawk Tribe and the State of New York have mutually agreed * * * to the following provisions governing the conduct of Class III gaming activities on the lands of the Tribe * * * [to] (b) develop and implement a means of regulation for the conduct of Class III gaming on Indian lands.” Section 3 (a) of the Compact refers to appendix A for a list of games to be conducted under the Compact. Included in this list are baccarat and blackjack, two games which are specifically carved out as being class III gaming (see 25 USC § 2703 [7] [B] [i]; [8]). Not only does the 1993 Compact authorize class III gaming, it also involves the State of New York in the investigation and maintenance of the gambling facility. The Tribe is to reimburse the State of New York for its expenses.
The 1999 Amendment to the Compact was equally violative of the New York State Constitution in that it sought to allow computerized versions of class III gaming. The record indicates that despite the expiration of this amendment and the fact that its validity is a moot issue, the gambling authorized by that amendment continues today and is an issue before this Court.
*831 Class III gaining is against public policy and has been since before this State’s first Constitution. Moreover, Penal Law § 225.05 provides, “A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity.” The Penal Law further defines what constitutes advancing gambling activity:
“A person ‘advances gambling activity’ when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation” (Penal Law § 225.00 [4]).
California v Cabazon Band of Mission Indians (480 US 202 [1987] )[4] does not negate the more than 200-year-old New York antigambling policy. First, the case did not involve a state like New York with a clear antigambling policy. In the course of the Cabazon opinion, the Supreme Court stated, “In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular” (480 US at 211). Second, no compact between a state and an Indian tribe was involved. The issue was not, as here, whether a compact violated the State Constitution but whether a California statute and county ordinances dealing with bingo and other forms of gambling were criminal or civil for purposes of Public Law 280 (67 US Stat 588, as amended).
A review of the facts in Cabazon makes clear that it is distinguishable from the case before us. The Cabazon and Morongo Bands of Mission Indians occupy reservations in Riverside County, California. Each band conducts bingo games, open to the general public, on their reservations. The Cabazon *832 Band also operates a card club for playing draw poker and other card games, which are open to the public.
California, which permits only charitable organizations to play bingo, sought to enforce an anti-bingo statute (Cal Penal Code § 326.5 [West Supp 1987]). Riverside County sought to enforce an anti-bingo ordinance and ordinances prohibiting draw poker and other card games (Ordinance Nos. 331, 558). The actions of the State and County were taken pursuant to Public Law 280.
The Tribes sued the County in Federal District Court seeking a declaratory judgment that the defendants had no authority to apply its laws inside the reservations and an injunction against their enforcement. The State intervened. The District Court granted the Tribes’ motion for summary judgment, holding that neither the State nor the County had any authority to enforce its gambling laws within the reservations. The Court of Appeals affirmed, stating that state laws may be applied to tribal Indians on their reservations if Congress has expressly consented.[5]
[6]
Public Law 280 gave California and five other states jurisdiction over specified areas of Indian lands. California was given broad authority to enforce its criminal laws on Indian lands. It was given only limited authority to enforce its civil laws on Indian lands so as not to attempt a total assimilation of Indian tribes, which retain attributes of sovereignty, into American society. The question in this case was whether the antigambling laws were primarily criminal or civil in nature.
The Supreme Court noted that the Court of Appeals distinguished a state’s “criminal/prohibitory” laws and state “civil/ regulatory” laws as follows: “if the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280’s grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation” (California v Cabazon Band of Mission Indians, 480 US 202, 209 [1987], citing Barona Group of Capitan Grande Band of Mission Indians v Duffy, 694 F2d 1185 [9th Cir 1982], cert denied 461 US 929 [1983]).
In affirming Cabazon, the United States Supreme Court agreed with this distinction while noting this “is not a bright- *833 line rule” and left room for the argument that the bingo statute is prohibitory rather than regulatory {id. at 210). Thus, the Supreme Court concluded that the California statutes and ordinances regulating gambling were regulatory and civil, and not criminal and prohibitory, for purposes of Public Law 280.
Finally, I agree with the Appellate Division that the commercialized gambling authorized by the 1993 Compact is a clear violation of the New York Constitution.[6] That Court stated:
“Under the circumstances, we conclude that the commercialized Las Vegas style gambling authorized by the compact is the antithesis of the highly restricted and ‘rigidly regulated’ (NY Const, art I, § 9 [2]) forms of gambling permitted by the NY Constitution * * * and New York’s established public policy disfavoring gambling.” {Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 24 [2002].)
The People of the State of New York have decided in New York’s Constitution to prohibit commercial gambling.[7] If the elected representatives of the People want to change that policy, they should begin the process of amending the Constitution.[8]

. I agree with the majority that the plaintiffs have standing under State Finance Law § 123-b. I agree with the Appellate Division that several *826 organizations, having alleged cognizable harm to their members, also have standing. As stated by the Appellate Division in its August 24, 2000 opinion: “New Yorkers for Constitutional Freedoms is a not-for-profit corporation representing approximately 1,650 churches and groups throughout the State whose individual members are opposed to casino gambling and support the constitutional operation of government. The Coalition Against Casino Gambling is a not-for-profit association whose individual members reside primarily in the Catskills and are opposed to casino gambling in that region. Similarly, the Western New York Coalition Against Casino Gambling is an unincorporated association representing religious organizations and grassroots citizens who oppose casino gambling in this State” (275 AD2d 145, 155-156 [2000]).

. Governor William Tryon took his oath of office on July 9, 1771.

. While the dissent cites Connecticut as support for its position that class III gaming should be permitted here, the Connecticut Constitution does not have antigambling provisions similar to those in the New York Constitution.

. Nothing requires this Court to await a lower court’s view of a case before addressing that case.

. Under 18 USC § 1162 and 28 USC § 1360, Congress expressly granted six states the right to enforce their laws (both civil and criminal) over Indian tribes: Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin.

. The plaintiffs in both cases have addressed article I, § 9, arguing that it prohibits the gambling authorized by the 1993 Compact.

. All of those who negotiated the 1993 Compact, as well as those who passed budgetary provisions in its support, were well aware of the antigambling provisions of the New York State Constitution. The specific gambling permitted in article I, § 9 is in no way authority to permit commercial gambling.

. Following oral argument in this case, the Attorney General submitted to this Court a memorandum of understanding between the State of New York and the St. Regis Mohawk Tribe. Among the provisions of the memorandum are (1) a casino to be built in Sullivan County for class III gaming, (2) the prohibition of any slot machines by entities other than Indian tribes acting pursuant to Indian Gaming Regulatory Act in the geographic areas of Bronx, Delaware, Greene, Kings, New York, Orange, Queens, Richmond, Rockland, Sullivan and Ulster Counties and (3) payments to New York State of 20% of the proceeds from slot machines for the first four years of a compact and 25% for the period after four years.