State of OREGON and John
A. Kitzhaber, Governor,
Plaintiffs,

v.

Gale NORTON, Secretary of the United
States Department of the Interior;
and Neal A. McCaleb, Assistant Secre-
tary for Indian Affairs, United States
Department of the Interior, Defen-
dants,

and

Confederated Tribes of the Coos,
Lower Umpqua and Siuslaw
Indians, Intervenor.

No. CIV. 02–6104–TC.

United States District Court,
D. Oregon.

July 1, 2003.

See also 116 F.Supp.2d 155.

David E. Leith, Department of Justice, Salem, OR, for Plaintiffs.

Timothy W. Simmons, United States Attorney's Office, Portland, OR, for Defendants.

## OPINION AND ORDER

COFFIN, United States Magistrate Judge.

For the second time, a federal district court is called upon to decide whether a

parcel of land held in trust for Intervenor Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians ("the Tribe") may be considered land restored to the Tribe and thus eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.* Plaintiffs State of Oregon and the Governor ("the State") challenge a decision by the Secretary of the United States Department of the Interior ("the Secretary") that the parcel of land known as the Hatch Tract was acquired as part of the restoration of lands to the Tribe. *See* 25 U.S.C. § 2719(b)(1)(B)(iii). The State contends that Congress did not delegate authority to the Secretary to make such a determination, and that even such authority existed, the Secretary abused her discretion in finding that the Hatch Tract constitutes restored land. The State seeks review of the Secretary's decision pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

On May 7, 2003, the court heard oral argument on the parties' cross-motions for summary judgment. Upon review and consideration of the briefing, argument, and relevant authorities, the State's motion is denied, and the Secretary's and the Tribe's motions are granted.

## I. BACKGROUND FACTS

The Tribe is presently a federally recognized Indian tribe with a governing body recognized by the Secretary. The Tribe is headquartered in Coos Bay, Oregon.

On August 13, 1954, the United States terminated the Tribe's status as a federally recognized Indian tribe. *See* Indians of

Western Oregon Termination Act, as codified in 25 U.S.C. §§ 691–708. As a result, the Tribe's reservation lands were dispersed, and the Tribe and its members could not participate in federal Indian programs or receive services provided by the United States to recognized Indian tribes.[1]

On October 17, 1984, Congress restored the Tribe's status under the Coos, Lower Umpqua and Siuslaw Restoration Act ("Restoration Act"). 25 U.S.C. §§ 714–714f. Section 7 of the Restoration Act provided for establishment of a reservation and authorized the Secretary to take three specific parcels of land into trust for the benefit of the Tribe:

> One parcel consists of 6.1 acres, upon which is a meeting hall where tribal business has been conducted since 1937. This land is held in private trust and is untaxed. Another parcel, which is undeveloped, consists of 1.02 acres on Coos County that is an historic fishing site. The third parcel is a 3–acre cemetery in Curry County that is also untaxed.

130 Cong. Rec. 22,422 (1984) (cited in Intervenor–Defendant's Memorandum of Points and Authorities, p. 8); *see also* 25 U.S.C. § 714e(b).

On October 14, 1998, Congress amended the Restoration Act to include an additional parcel of land known as the Peterman Tract located in Lane County, Oregon, near the town of Florence. The Peterman Tract, comprising .6 acres of land, is a right-of-way to an Indian cemetery containing the remains of tribal ancestors.

The Hatch Tract is a 98–acre parcel of land contiguous to the Peterman Tract. It is the site of a former Siuslaw village and

---

**1.** The devastating effects of termination have been well-documented as set forth in the Tribe's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, pp. 4–7, and the court does not recount them here.

located within the former Siletz Reservation, to which the Tribe's members were removed in 1862. The Hatch Tract was a public domain allotment subsequently deeded to an ancestor of a tribal member. The Hatch Tract has always been held by the Tribe or its members, and it has never been subject to state or local taxation. After the death of a tribal member who occupied the land, the family sought to transfer the Hatch Tract to tribal ownership and offered the land to the Tribe. Sometime prior to March 1998, the Tribe requested that the Secretary accept the Hatch Tract into trust for the benefit of the Tribe. On March 2, 1998, the Secretary officially acquired the Hatch Tract in trust.

On March 16, 1998, in a meeting between representatives of the Tribe and the Bureau of Indian Affairs, the Tribe orally requested that the Hatch Tract be certified as exempt from IGRA's gaming prohibition on lands acquired after October 17, 1988, the effective date of IGRA. 25 U.S.C. § 2719(a). The Tribe asserted that the Hatch Tract qualified for exemption as either "land located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988," 25 U.S.C. § 2719(a)(1) (contiguous lands exception), or lands taken into trust as part of the "restoration of lands" to a restored tribe. *Id.* § 2719(b)(1)(B)(iii) (restored lands exception). The Tribe memorialized this request in a letter dated March 23, 1998. On April 20, 1999, the Tribe repeated their request in a meeting with Department of Interior representatives.

By letter dated October 21, 1999, the Secretary determined that the Hatch Tract did not qualify for gaming under either exception. The Secretary found that the Hatch Tract was not contiguous to the Tribe's reservation boundaries as of October 17, 1988, because the 1998 addition of the Peterman Tract to the Tribe's reservation did not relate back to the establishment of the reservation on October 17, 1984. Further, the Secretary adopted the opinion and conclusion of the Solicitor that the phrase "restoration of lands" referred only to the congressional restoration of lands identified in a congressional act of restoration. Therefore, because the Hatch Tract was not identified in the Restoration Act, the Secretary determined that it did not constitute lands restored to the Tribe.

The Tribe challenged the Secretary's decision in the United States District Court for the District of Columbia. *See Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians v. Babbitt,* 116 F.Supp.2d 155 (D.D.C.2000) (hereinafter *Confederated Tribes*). The district court upheld the Secretary's determination that the Hatch Tract was not contiguous to the Tribe's reservation boundaries as of October 17, 1988. However, the district court rejected the Secretary's contention that the word "restore" was a term of art and that the phrase "restoration of lands" included only those lands identified by Congress in an act restoring tribal status. *Confederated Tribes,* 116 F.Supp.2d at 163. Rather, the district court found that "restore" and "restoration lands" could be construed in accordance with the intent to limit gaming on lands acquired after the enactment of IGRA while affording parity to "belatedly restored tribes." *Id.* at 164. In so finding, the court relied on the analysis and reasoning set forth in *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan,* 46 F.Supp.2d 689

(W.D.Mich.1999) (*Grand Traverse I*).[2] *Confederated Tribes*, 116 F.Supp.2d at 163–64.

The district court concluded that the Secretary "used an unduly restrictive analysis in determining that the Hatch Tract was ineligible for gaming," and "failed to adequately consider the principle of liberal [statutory] construction in favor of Indians." *Id.* at 164. Thus, the district court remanded the matter to the Secretary to "fully consider all matters which may entitle [the Tribe] to an exception pursuant to section 2719(b)(1)(B)(iii)." *Id.*

Upon remand, the Secretary informed the Tribe by letter dated December 20, 2002, that the Hatch Tract was exempt from IGRA's general prohibition on gaming. With guidance from the district court in *Confederated Tribes*, the Secretary construed the terms restore and restoration of land in accordance with their ordinary meaning coupled with geographical and temporal limitations. The Secretary reviewed the materials relevant to the Hatch Tract and found that it reflected a historical, geographical and temporal connection to the Tribe. Thus, the Secretary concluded that the Hatch Tract constituted lands restored to the Tribe.

On April 12, 2002, the State filed suit challenging the Secretary's determination that the Hatch Tract was eligible for gaming under IGRA.

In January 2003, the Tribe and the State amended the Tribe's gaming compact by mutual agreement. With respect to the location of the Tribe's casino, the compact provides:

**2.** In *Grand Traverse I*, the district court addressed a motion for preliminary injunction. The court later issued a final opinion on the merits affirming its previous analysis. *See*

*Gaming Location.* As of the date of this Compact, the parties are in disagreement regarding whether certain lands, known as the "Hatch Tract," . . . are eligible for gaming, pursuant to 24 U.S.C. § 2719. The Secretary of the U.S. Department of the Interior issued a decision that the Hatch Tract is eligible for gaming; however, the State and the Governor are challenging that decision in a case entitled *Oregon v. Norton,* Civil Case No. 02–6104–TC (D.C. Or. filed Apr. 12, 2002). In the event there is a final judicial decision in that case that the Hatch Tract is eligible for gaming, pursuant to 25 U.S.C. § 2719, the Tribes' Gaming Facility authorized by the Compact shall be located on the Hatch Tract.

Amended Tribal–State Compact for Regulation of Class III Gaming Between the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians and the State of Oregon, § 4(C) (Jan. 6, 2003) (attached to the Tribe's Memorandum of Points and Authorities in Support of Motion for Summary Judgment).

## II. STANDARDS

The State seeks review of the Secretary's decision pursuant to the APA. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."). Under the APA, the court must uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan,* 198 F.Supp.2d 920 (W.D.Mich.2002) (*Grand Traverse II*).

5 U.S.C. § 706(2)(A). Although "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Consequently, a court may set aside an agency's decision "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Western Radio Services Co. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996).

■ A court reviews an agency's interpretation of a statute under a two-part analysis. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is whether Congress has directly addressed the question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If Congress's intent is unclear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

■ In reviewing an agency's interpretation of a statute governing Indian tribes, the court must also consider canons of construction relevant to Indian law.

"The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). Thus, "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

All parties move for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Here, the parties seek summary judgment based on review of the administrative record, and all agree that no issues of material fact preclude summary judgment.

### III. DISCUSSION

IGRA generally prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). Under the restored lands exception to this prohibition, gaming may be conducted on after-acquired lands when those "lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii). Furthermore, casino-style gaming must be conducted pursuant to a gaming compact entered into by a tribe and the state and approved by the Secretary. 25 U.S.C. §§ 2703(8), 2710(d)(1)(C), and 2710(d)(8)(A). Here, the State and the Tribe have entered into

a gaming compact which approves the Hatch Tract as the site for the Tribe's gaming facility if the Secretary's determination is upheld.

Despite the ruling of the district court in *Confederated Tribes* and the accordant decision of the Secretary, the State argues that the Secretary lacks authority to interpret the restored lands exception. Rather, the State contends that only Congress can authorize the restoration of lands as part of the act which restores a tribe's status. The State further argues that even if the Secretary possesses such authority, her interpretation of the phrase "restoration of lands" is contrary to the special meaning intended by Congress.[3] The State maintains that any discretion held by the Secretary is limited to a simple comparison between the lands held in trust for a particular tribe and lands identified by Congress in the relevant act of restoration. Because the Hatch Tract is not identified in the Tribe's Restoration Act, the State contends that it does not qualify as restored lands and that the Secretary's determination is arbitrary, capricious, and not in accordance with law.

At oral argument, the State conceded that these two arguments were merely different sides of the same coin—that the Secretary has no authority to interpret the restored lands exception and determine whether lands held in trust are lands restored to a tribe. Indeed, if the Secretary's discretion is limited to a ministerial comparison of lands, it is because she has no authority to do otherwise. Although the State quarrels with temporal and geographical limitations employed by the Secretary, it does so only to the extent that those limitations do not exclude lands which are not identified in a restoration act. *See* Oregon's Response to Defendants' and Defendant–Intervenor's Motions for Summary Judgment, pp. 12–13. In fact, the State does not dispute the Secretary's findings and conclusions that the Hatch Tract bears a significant historical, geographical, and temporal connection to the Tribe. The State thus acknowledges that if the Secretary is authorized to determine whether lands are restored, the Hatch Tract qualifies as restored land under the factors set forth by the Secretary. Accordingly, the pivotal issue before the court is whether the Secretary lacks the authority to interpret the phrase "restoration of lands" within the restored lands exception.[4]

The first question is whether Congress has directly spoken to this issue.

---

**3.** It is tempting to suggest that the State should be precluded from raising the same argument asserted by the federal government and soundly rejected by the district court in *Confederated Tribes*, particularly in light of the fact that the State had notice of that proceeding and could have intervened. However, the application of collateral estoppel is a dubious proposition given the lack of privity between the federal government and the State, in that their interests may not be identical. Regardless, the Tribe and the federal government did not rely on this issue at oral argument and the court does not discuss it.

**4.** The court recognizes that the Secretary's decision and the Tribe's intent to operate a gaming facility on the Hatch Tract has generated intense controversy in the surrounding community over the suitability of gaming at that location. However, the court's narrow role in this dispute is limited to reviewing the Secretary's authority to decide whether the Hatch Tract is restored lands. It is beyond the court's jurisdiction to consider the merits or wisdom of constructing a gaming facility on the Hatch Tract. The court notes, however, that the Tribe and the State conferred with respect to the intended gaming-facility site, and aside from its contention that the Hatch Tract is not restored lands, the State does not oppose the Hatch Tract as the intended site of the Tribe's gaming operations.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. No statutory provision defines the terms "restore" or "restoration of lands" and no provision expressly limits the Secretary's authority to interpret these terms. *See Confederated Tribes,* 116 F.Supp.2d at 162. Thus, I find the statutory language ambiguous and turn to the question of whether the Secretary's interpretation is based on a permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. "In determining whether an agency's construction is permissible, the court considers whether Congress has explicitly instructed the agency to flesh out specific provisions of the general legislation, or has impliedly left to the agency the task of developing standards to carry out the general policy of the statute." *Tovar v. United States Postal Service,* 3 F.3d 1271, 1276 (9th Cir.1993). Where the delegation of authority is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

The State argues that the lack of a specific delegation of authority to interpret the term "restoration of lands" implies congressional intent to withhold such authority from the Secretary. However, such "gaps" in statutory language are wholly consistent with the routine delegation of powers granted to agencies which have considerable and specialized expertise. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.") (footnote omitted); *Association of Public Agency Customers, Inc. v. Bonneville Power Ad-*

*min.,* 126 F.3d 1158, 1169 (9th Cir.1997) ("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for an agency to fill.").

 Congress has delegated sweeping authority to the Secretary in interpreting and administering laws governing Indian tribes. *See* 25 U.S.C. § 9 ("The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs."); *id.* § 2 ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."); *id.* § 465 ("The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands ... for the purpose of providing land for Indians."). Moreover, IGRA contains no restriction on the Secretary's general authority to interpret laws governing Indian tribes.

 Indeed, when a court recently determined that the Secretary did not enjoy a broad delegation of power under IGRA, Congress quickly corrected that misapprehension. In *Sac and Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1265 (10th Cir.2001), the Tenth Circuit held that the Secretary lacked authority to interpret the term "reservation" under the contiguous lands exception, because IGRA charged the National Indian Gaming Commission—rather than the Secretary—with regulatory oversight of Indian gaming. *Id.* at 1265. "Presumably, the Commission's au-

thority also includes interpreting any ambiguous phrases or terms contained in IGRA." *Id.* In response, Congress passed legislation declaring, "The authority to determine whether a specific area of land is a 'reservation' for purposes of [25 U.S.C. §§ 2701–2721] was delegated to the Secretary of the Interior on October 17, 1988." Pub.L. No. 107–63, § 134 (2001). It requires no great leap of logic to conclude that the Secretary's authority to interpret the term "reservation" within the contiguous lands exception extends to the phrase "restoration of lands" within the restored lands exception. Therefore, I find that the restored lands exception contains an implicit delegation of authority to the Secretary to provide meaning to the terms "restore" and "restoration" of lands.

Having found that the Secretary possesses the authority to interpret the meaning of "restore" and "restoration of lands," the court must defer to her interpretation unless it is unreasonable. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.[5] As an initial point, the court addresses the State's argument that canons of construction favoring Indian tribes are inapplicable in reviewing the Secretary's interpretation. The State maintains that while the Secretary's interpretation may favor some tribes, it does not necessarily favor all tribes. The State points to *City of Roseville v. Norton,* 219 F.Supp.2d 130 (D.D.C.2002), where the district court upheld the restoration of land identified in the restoration act of the Auburn Indian Tribe, even though the land arguably bore no temporal or geographical relationship to that tribe. *Id.* at 159–63. I fail to discern any detriment to Native Americans arising from a construction of IGRA authorizing the Secretary to declare as restored those lands bearing a significant connection to an Indian tribe, in addition to lands specifically identified in a restoration act. The Secretary's interpretation of the restored lands exception does not trump Congress's identification of lands within a restoration act. Rather, if a particular parcel of trust land is not identified in a restoration act, the task falls to the Secretary to determine whether such land is restored. Thus, the court considers the applicable Indian law canon of construction in reviewing the Secretary's interpretation of the restored lands exception.[6]

**5.** The State's reliance on *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) and *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) to lessen the degree of deference due is misplaced. In *Mead,* the Supreme Court held that the application of *Chevron* deference depends on the extent of the authority delegated by Congress rather than the categorization of the decision-making process. *Mead,* 533 U.S. at 226–27, 121 S.Ct. 2164 (*Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."). The Supreme Court subsequently held that agency interpretations reached through means less formal than notice and comment rulemaking are not "automatically deprive[d]" of *Chevron* deference, and declared that "[i]f this Court's opinion in [*Christensen*] suggested an absolute rule to the contrary, our later opinion in [*Mead Corp.*] denied the suggestion." In *Barnhart v. Walton,* 535 U.S. 212, 220–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (citations omitted).

Regardless, the State's arguments over the application of *Chevron* deference raise distinctions without a difference. Even if the Secretary's determination is entitled to the lesser standard in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the result is the same.

**6.** The Ninth Circuit recently declined to engage in a broader discussion of the role of the canons of construction favoring Indians within the *Chevron* analysis. *See Navajo Nation v.*

The State argues that the term "restore" is a congressional term of art meaning the congressional act of restoring federal recognition to an Indian tribe, and that "restoration of lands" is thus limited to those lands identified by Congress within a particular restoration act. In other words, the State asks that this court reject the ruling of the district court in *Confederated Tribes* and set aside the Secretary's decision. Notwithstanding that accepting the State's argument would present the Secretary with conflicting district court orders on the same issue, the primary obstacle to the State's position is the fact that no legal authority supports it.

 Instead, I adopt by reference the sound reasoning and analysis in *Confederated Tribes* and in *Grand Traverse II* and find that the terms "restore" and "restoration of lands" are not terms of art and should be construed in accordance with their ordinary meanings. *See Confederated Tribes*, 116 F.Supp.2d at 163 ("The defendants' 'special meaning' argument seem to proceed, not from the special meaning Congress gave to the word 'restoration' (because it did not), but merely from the fact that Congress used the word at all."); *Grand Traverse II*, 198 F.Supp.2d at 931 ("Congressional use of the words [restore and restoration] appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words.").

In *Grand Traverse II*, the district court rejected the argument that the restored lands exception applied to only those tribes whose federal recognition was restored through a congressional enactment and not to those tribes recognized through agency acknowledgment. *Grand Traverse II*, 198 F.Supp.2d at 930–31. After a thorough discussion of the statutory language, the court concluded:

> The State has failed to identify any basis for concluding that Congress intended that the word "restore" as used in IGRA should be limited by the words used by Congress in enacting statutes of restoration or that Congress intended to prohibit the use of the word "restore" when tribes used the acknowledgment process.

*Id.* at 931. Likewise, the State here fails to identify any intent to limit "restoration of lands" to lands described in a restoration act.

Under the State's construction, lands identified by Congress in a restoration act with no historical connection to the tribe may be "restored" within the meaning of IGRA, whereas lands taken into trust by the Secretary bearing a strong historical significance to the tribe, but not identified in a restoration act, may not. The State's preferred interpretation has no basis in the language or underlying intent of IGRA, is inconsistent with the common and ordinary meaning of the term, and violates the canons of construction favoring Indian tribes.

Finally, the State relies on the 1998 technical amendment to the Tribe's Restoration Act as evidence that the Hatch Tract was not intended by Congress to be lands restored to the Tribe. As pointed out by the federal government, restoration

*Dep't of Health and Human Servs.*, 325 F.3d 1133, 1136 n. 4 (9th Cir.2003) ("[W]e leave for another day consideration of the interplay between the *Chevron* and *Blackfeet Tribe* presumptions.").

acts are products of political negotiation in accordance with the parties' relative power in Congress. Absent explicit evidence of congressional intent, I am disinclined to ascribe a greater meaning to the addition of the Peterman Tract as reservation lands of the Tribe.

 In sum, I find that the phrase "restoration of lands" was not intended by Congress to be narrowly construed and limited to the lands included in the congressional enactments which restore tribal status. Therefore, the Secretary's interpretation is a permissible and reasonable construction of the statute. The State concedes that the Hatch Tract qualifies as restored lands under the factors relied upon by the Secretary, and that her decision was not arbitrary or capricious in that regard. Accordingly, I defer to the Secretary's decision that the Hatch Tract, as lands held in trust as part of the restoration of lands to the Tribe, is exempt from IGRA's gaming prohibition on lands acquired after October 17, 1988.

### CONCLUSION

IGRA grants the Secretary authority to determine whether lands are "restored" and thus eligible for gaming purposes. In exercising this authority, the Secretary did not abuse her discretion in declaring that Hatch Tract are restored lands of the Tribe. Accordingly, the State's Motion for Summary Judgment (doc. 25) is DENIED, and the Secretary's and the Tribe's Motions for Summary Judgment (docs. 35, 41) are GRANTED. The State's Complaint is HEREBY DISMISSED. IT IS SO ORDERED.