Argued and submitted October 23, 2012, affirmed November 14, 2013, petition for review denied February 28, 2014 (354 Or 838)

STATE ex rel Susan DEWBERRY,
Carol Holcombe, Suzanne Danielson,
and Arnold Buchman,
*Relators-Appellants,*

*v.*

The Honorable John KITZHABER,
Governor of the State of Oregon;
and other Executive Officers in the State of Oregon,
*Defendants-Respondents,*

*and*

THE CONFEDERATED TRIBES OF THE COOS,
LOWER UMPQUA AND SIUSLAW INDIANS,
*Intervenor-Respondent.*

Lane County Circuit Court
160323044; A146366

313 P3d 1135

Karsten H. Rasmussen, Judge.

Kristian Roggendorf argued the cause for appellants. With him on the briefs were Kelly Clark and O'Donnell, Clark & Crew LLP.

Stephanie L. Striffler, Senior Assistant Attorney General, and Bruce R. Greene, *pro hac vice*, Boulder, Colorado, argued the cause for respondents. With them on the joint brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General, and Sharon A. Rudnick.

Dennis Karnopp, Shayleen Allen, Brett Kenney, Dirk Doyle, Dan Hester, Rob Greene, and Craig J. Dorsay filed the joint brief *amici curiae* for Confederated Tribes of the Warm Springs Reservation, the Klamath Tribes, the Coquille Indian Tribe, the Cow Creek Band of Umpqua Tribe of Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Grand Ronde Community of Oregon, and the Confederated Tribes of Siletz Indians of Oregon.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

In 2003, respondents, the Governor and other executive officers of the State of Oregon, signed a tribal-state gaming compact between the state and the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians (the Tribes) pursuant to the Indian Gaming Regulatory Act, 25 USC §§ 2701 - 2721 (IGRA). Under IGRA, states are required to negotiate with tribes in good faith for a compact covering all gaming activities that are permitted in a state "for any purpose by any person, organization, or entity." 25 USC § 2710(d)(1)(B); 25 USC § 2710(d)(3)(A) (good faith requirement). The 2003 gaming compact concerned so-called class III gaming activities at a casino on Indian lands located within the geographic borders of Oregon near Florence. Relators Dewberry, Holcombe, Danielson, and Buchman own property in or near Florence. They have long opposed the development of the casino and, in this mandamus action, sought to require the Governor to withdraw his signature from the tribal-state gaming compact. The trial court agreed with the state and the Tribes that the Governor had authority to sign the compact and that the compact was valid. The court granted their motions for summary judgment and denied relators' motion for summary judgment. We affirm the trial court's judgment.

## I.   FACTS AND PROCEDURAL HISTORY

This action has an extensive procedural background, including parallel federal litigation and an earlier appeal resulting in the Oregon Supreme Court's remand of the case to the trial court in 2009. The salient facts, however, are straightforward and undisputed. We begin with the facts concerning the compact and development of the Tribes' casino and then summarize the procedural background of relators' legal challenges to the casino's development and continuing operation.

The Tribes are a federally-recognized Indian tribe with headquarters in Coos Bay. Their status as a federally-recognized Indian tribe was restored in 1984 after being terminated in 1954. *Oregon v. Norton*, 271 F Supp 2d 1270, 1272 (D Or 2003).

The Tribes built and operate the Three Rivers Casino & Hotel, a facility with more than 90 rooms and suites, a casino, and five restaurants, on the Hatch Tract. The Hatch Tract is a 98-acre parcel of Indian land located in Florence. *Norton*, 271 F Supp 2d at 1272. The Hatch Tract lies within the former Siletz Reservation, to which the Tribes were removed in 1862, and has been held by the Tribes or its members since then. *Id.* at 1272-73. In 1998, the Secretary of the Interior acquired the Hatch Tract in trust for the benefit of the Tribes. *Id.* at 1273.

Under IGRA, tribes may engage in "class III" casino-style gaming on Indian lands if, among other things, such gaming is authorized by a tribal-state gaming compact. 25 USC § 2710(d)(1)(C). In 2002, the Tribes began negotiating a gaming compact with Governor Kitzhaber to authorize casino-style gaming, including card games (blackjack, several forms of poker, let-it-ride, mini-baccarat), various other games of chance (video lottery, keno, big 6 wheel, roulette, craps), and off-track wagering on animal racing, at a casino on the Hatch Tract.

In January 2003, the state and the Tribes signed their Amended Tribal-State Compact for Regulation of Class III Gaming Between the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians and the State of Oregon. However, IGRA prohibits any gaming on Indian lands acquired after October 17, 1988, subject to an exception for restored lands. 25 USC § 2719(b)(1)(B)(iii). Because the Secretary acquired the Hatch Tract in 1998, the compact required a final determination that the Hatch Tract was subject to the restored lands exception in IGRA. The Tribes were able to achieve that determination.

In 2002, after litigation initiated by the Tribes, the Secretary concluded that the Hatch Tract had a historical, geographical, and temporal connection to the Tribes and constituted lands restored to the Tribes under IGRA. *Norton*, 271 F Supp 2d at 1274. Although the state challenged that determination in federal district court, that court affirmed the Secretary's determination in July 2003, *id.* at 1280, and the state did not appeal.

The Secretary's determination that the Hatch Tract constituted restored lands paved the way for the compact to go into effect. In February 2003, the Acting Assistant Secretary - Indian Affairs, pursuant to the Secretary of the Interior's delegation of authority, approved the compact. The Tribes moved forward with development of the casino, and, in January 2004, the Tribes' Gaming Ordinance 30B was approved by the Chairman of the National Indian Gaming Commission. The Tribes' casino opened in the summer of 2004.

While the Tribes moved forward with developing and opening the casino, relators took legal action to try to halt the casino's development. Several months after the state's unsuccessful challenge to the secretary's determination that the Hatch Tract constituted restored lands, relators initiated litigation. Relators began by seeking a writ of mandamus against Governor Kulongoski from the Oregon Supreme Court in September 2003 to enjoin further development of the casino on the Hatch Tract, which the court denied in an order issued in November 2003.

Relators then commenced this action in December 2003, petitioning the Lane County Circuit Court for a writ of mandamus. In response, the state argued, among other things, that relators were not entitled to relief because they had an adequate remedy at law under the Oregon Declaratory Judgments Act, ORS 28.010 to 28.160. In 2004, the circuit court entered a judgment dismissing relators' mandamus petition, which they appealed. We allowed relators' appeal to be held in abeyance pending the resolution of their separate declaratory judgment action. *State ex rel Dewberry v. Kulongoski*, 220 Or App 345, 349, 187 P3d 220 (2008), *aff'd*, 346 Or 260, 210 P3d 884 (2009).

Relators filed their complaint under the Oregon Declaratory Judgments Act in March 2004. *Id.* The defendants were Governor Kulongoski, other state executive officers, and the Tribes. The state defendants then removed the case from the circuit court to the United States District Court for the District of Oregon. *Id.* The district court dismissed the declaratory judgment action upon granting the defendants' summary judgment motions. *Dewberry v.*

*Kulongoski*, 406 F Supp 2d 1136, 1157 (D Or 2005). The district court concluded that relators lacked standing because their alleged injuries were not sufficiently concrete or particularized. *Id.* at 1143. The court also concluded that the Tribes were an indispensable party because an adverse disposition in the litigation—a challenge to the Tribes' compact with the state—would, as a practical matter, impede or impair the Tribes' ability to protect their interests. *Id.* at 1147. The court further ruled that the Tribes had sovereign immunity, *id.* at 1146, and that the claims against the Tribes had to be dismissed because joinder of the Tribes was not feasible. *Id.* at 1150. The court nevertheless went on to address the merits of the parties' arguments concerning IGRA in the interests of judicial economy, in an effort to avoid the need for remand to the state circuit court after an appeal to the Ninth Circuit Court of Appeals. *Id.* at 1142. On the merits, the district court concluded that the tribal-state gaming compact between the state and the Tribes was valid and that the state had authority to enter into the compact. *Id.* at 1152-57.

After losing the declaratory judgment action in the district court, however, relators chose not to appeal and instead litigated their challenge to the gaming compact in their pending mandamus action on appeal in this court. Relators reactivated their first appeal in this case and were successful in reversing the dismissal of their petition for a writ of mandamus. *State ex rel Dewberry*, 220 Or App at 349, 361.

We concluded in the first appeal in this case that the trial court erred in dismissing relators' petition and reversed and remanded. *Id.* at 361. We held that a declaratory judgment action was not a plain or adequate remedy at law for two reasons: (1) the Tribes controlled the availability of an adjudication on the merits through their status as a necessary party and ability to assert sovereign immunity in such an action, *id.* at 358-59; and (2) the Tribes did not have to be joined as a party in this action because ORCP 29 A, concerning joinder of parties needed for just adjudication of an action, does not apply to mandamus proceedings, *id.* at 354. The Supreme Court granted review, affirmed, and remanded to the trial court for further proceedings. *State ex rel Dewberry v. Kulongoski*, 346 Or 260, 210 P3d 884 (2009).

On remand in the trial court, the Tribes sought and were allowed to intervene, thus waiving their sovereign immunity. The parties then filed summary judgment motions directed to the second amended alternative writ of mandamus issued by the trial court. Relators requested that the trial court command the state and the Tribes to withdraw the Governor's signature from, and to rescind, the compact; to forbid the state's agencies and employees from taking action in furtherance of the compact; and to discontinue all executive branch actions authorizing or permitting the operation of the casino. Almost all federally recognized Indian tribes in Oregon jointly moved for leave to file an *amici curiae* brief, which the court permitted.

The trial court then issued an opinion and order granting summary judgment in favor of the state and the Tribes and denying relators' summary judgment motion. The trial court first ruled that relators had standing to bring the action and rejected the state's and the Tribes' arguments that the action was precluded by the outcome in the declaratory judgment action in the district court or by laches.[1] On the merits, the trial court rejected relators' arguments that the compact is invalid because (1) the Governor lacked constitutional and statutory authority under Oregon law to sign it; (2) the compact did not meet the requirements of IGRA; and (3) Article XV, section 4(10), of the Oregon Constitution,[2] which provides that "[t]he Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon," bans casinos anywhere within the state's borders, including on Indian lands. Relators now appeal the resultant general judgment of dismissal.

## II. ANALYSIS

### A. *An overview of IGRA*

Because IGRA is at the core of this case, our analysis begins with an overview of its genesis and relevant provisions. In a nutshell, IGRA is a comprehensive federal

---

[1] The state and the Tribes do not challenge those rulings in this court.

[2] Article XV, section 4(10), of the Oregon Constitution was numbered as section 4(12) before 2011, during the trial court proceedings and some of the appellate briefing. The text of the section did not change as a result of the renumbering.

statutory scheme for the regulation of gaming on Indian lands that preempts the application of state gaming laws.

Congress enacted IGRA after the United States Supreme Court decided *California v. Cabazon Band of Mission Indians*, 480 US 202, 107 S Ct 1083, 94 L Ed 2d 244 (1987). We therefore provide some background on that decision, which allowed tribal gaming despite contrary state and local regulation of gaming activities.

In *Cabazon Band*, two Indian tribes sought declaratory and injunctive relief to prevent the State of California and Riverside County, where their reservations were situated, from applying state and local gambling laws to bingo or card games that the tribes held on the reservations for tribal income. 480 US at 204, 206. The trial court granted the tribes' motion for summary judgment and ruled that the state and the county could not enforce their gambling laws on the reservations, and the Ninth Circuit affirmed. *Id.* at 206. The Supreme Court cast the issue as whether "state authority is pre-empted by the operation of federal law." *Id.* at 216. The Court observed that Indian tribes retain "attributes of sovereignty over both their members and their territory," and that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States[.]" *Id.* at 207 (internal quotation marks omitted). The Court proceeded to analyze the case "in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *Id.* at 216. The Court rejected California's argument that Congress had consented to state jurisdiction over tribal gaming through passage of Public Law 83-280 in the Act of August 15, 1953, ch 505, 67 Stat 588-90, now codified in 18 USC § 1162, 28 USC § 1360, and other sections of titles 18 and 28 of the United States Code (PL 280). In part, PL 280 originally transferred federal criminal jurisdiction over offenses committed by or against Indians within most Indian lands in five states, including Oregon and California, to those states and, to a certain extent, allowed state jurisdiction for civil matters in the courts of those states. The Supreme Court concluded that California's laws concerning

gaming were not criminal and prohibitory and instead were civil and regulatory; accordingly, California's gaming laws were not within PL 280's "grant of criminal jurisdiction." *Cabazon Band*, 480 US at 209-11. The Court also concluded that state law was preempted and affirmed the judgment, holding that the state's asserted interest in preventing infiltration of tribal gambling by organized crime did not justify state regulation in light of compelling federal and tribal interests that supported tribal gambling enterprises. *Id.* at 221-22.

In 1988, the year after *Cabazon Band* was decided, Congress passed IGRA to regulate the conduct of gaming on Indian lands. Congress declared that the purpose of IGRA is

"(1)  to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

"(2)  to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

"(3)  to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue."

25 USC § 2702. IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands." S Rep No 446, 100th Cong, 2d Sess, *reprinted in* 1988 USCCAN 3071, 3076.

IGRA separates types of gaming into three classes— class I, II, and III—subject to different levels of regulation. Class I gaming, regulated solely by tribes, 25 USC § 2710(a)(1), consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals

as a part of, or in connection with, tribal ceremonies or celebrations," 25 USC § 2703(6). Class II gaming, including bingo, lotto, and some card games, 25 USC §§ 2703(7)(A), (B), is regulated by tribes and the National Indian Gaming Commission (NIGC), 25 USC § 2710(b). Casino-style class III gaming, at issue in this litigation, is defined as "all forms of gaming that are not class I gaming or class II gaming." 25 USC § 2703(8). Class III gaming is lawful on Indian lands only if (1) located in a state that otherwise permits such gaming for any purpose by any person, organization, or entity; (2) conducted in conformity with a tribal-state compact; and (3) authorized by a tribal ordinance or resolution approved by the NIGC's Chair. 25 USC § 2710(d)(1).

The requirement of a tribal-state compact for class III gaming under IGRA was designed to reconcile tribal and state interests concerning such gaming. *See* S Rep No 446, 100th Cong, 2d Sess, *reprinted in* 1988 USCCAN at 3075-76 (describing controversy surrounding regulation of gaming on Indian lands, the "well-established principle * * * that * * * the application of state laws do not extend to Indian lands," and reconciliation of law enforcement concerns of the tribal, state, and federal governments). The Senate Committee on Indian Affairs noted "the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply," and "balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands." *Id.* at 3083. IGRA specifies the procedural requirements for tribal-state compacts, 25 USC §§ 2710(d)(3)(A), (B), and enumerates various provisions that the compacts may include, such as the civil and criminal laws that will be applicable to the licensing and regulation of the class III gaming activity, 25 USC § 2710(d)(3)(C).

Under IGRA, if a tribe plans to conduct class III gaming on its lands, it must first request that the state in which those lands are located enter into negotiations with the tribe for purposes of agreeing on a tribal-state compact to govern the class III gaming activities. 25 USC § 2710(d)(3)(A). In turn, the state must "negotiate with the Indian tribe in

good faith to enter into such a compact." *Id.* Under IGRA, tribes may enforce that obligation by suing states in federal court for the failure to negotiate in good faith. 25 USC §§ 2710(d)(7)(A), (B). If the court finds that the state failed to negotiate in good faith to conclude a tribal-state compact, the court "shall order the State and the Indian [tribe] to conclude such a compact within a 60-day period." 25 USC § 2710(d)(7)(B)(iii) (footnote omitted). IGRA also contains other dispute resolution mechanisms that will result in the Secretary's approval of procedures governing the gaming activities in the event of any impasse between the state and the tribe. 25 USC § 2710(d)(7)(B)(vii).

B. *The Governor's authority to enter into tribal-state gaming compacts*

With that overview of IGRA, we now turn to the assignments of error in this appeal. The trial court determined that the Governor has both statutory and constitutional authority to enter into tribal-state gaming compacts under state law.[3] In relators' first assignment of error, they contend that the trial court erred in granting summary judgment to the state and the Tribes because the Governor had no authority under state law to enter into the tribal-state gaming compact.

The trial court entered an opinion and order in which it set forth in detail its rulings and reasoning on the cross-motions for summary judgment. As to the Governor's statutory authority, the trial court ruled that the text of ORS 190.110(3) specifically authorized the Governor to execute the compact by empowering

"the Governor or the designee of the Governor to enter into agreements to ensure that the state, a state agency or unit of local government does not interfere with or infringe on the exercise of any right or privilege of an American Indian tribe or members of a tribe held or granted under any

---

[3] The parties agree that IGRA provides no independent grant of authority to the Governor to enter into the gaming compact. Several courts have held that the question of who is competent to negotiate and to enter into tribal-state compacts for a state under IGRA is a matter of state law. *See, e.g., Pueblo of Santa Ana v. Kelly,* 104 F3d 1546, 1558 (10th Cir), *cert den,* 522 US 807 (1997); *Saratoga County Chamber of Commerce v. Pataki,* 100 NY2d 801, 822, 798 NE2d 1047, *cert den,* 540 US 1017 (2003).

federal treaty, executive order, agreement, statute, policy or any other authority."

Among other things, the trial court also observed that ORS 190.007 directs that the "provisions of ORS 190.003 to 190.130 shall be liberally construed" and that legislative history supported its view of the text of ORS 190.110(3). As for the Governor's constitutional authority, the trial court concluded that three provisions of the Oregon Constitution grant such authority, citing Article V, section 10, which provides that the Governor has a duty to "take care that the Laws be faithfully executed"; Article V, section 13, which states that the Governor "shall transact all necessary business with the officers of government"; and Article XV, section 3, which requires the Governor to take an oath to "support the Constitution of the United States, and of this State."

The parties reiterate their positions before the trial court on this issue. Relators contend that the power to enter into a tribal-state compact properly lies solely with the Oregon legislature, not with the Governor. Relators argue that, because (1) the text of ORS 190.110 does not mention gaming casinos, (2) the statute was enacted before IGRA was enacted, and (3) Article XV, section 4(10), prohibits casinos in Oregon, the legislature did not intend to authorize the Governor to enter into the compact with the Tribes. Relators also contend that ORS 190.110, to the extent that it can be applied to authorize the Governor to enter into a tribal-state gaming compact, is unconstitutional in light of the ban on casinos in Article XV, section 4(10). Finally, relators broadly argue that no other constitutional provision addressing the duties and responsibilities of the Governor provides authority "for the Governor to set state policy on Indian casinos." The state and the Tribes jointly respond that the Governor had authority to enter into the compact on behalf of the state under ORS 190.110 and under the Oregon Constitution and that the prohibition on casinos in Article XV, section 4(10), is a restriction relating to the time, place, and manner of gaming in Oregon that does not apply to Indian lands located within the state's boundaries because it is preempted by IGRA. For the following reasons, we agree with the state and the Tribes.

### 1. *Statutory authority under ORS 190.110*

We begin with the Governor's authority to enter into the gaming compact under ORS 190.110. In their first assignment of error, relators contend that the trial court erred in its rulings on the summary judgment motions because the court wrongly concluded that "Oregon's Governor possessed authority to sign casino gaming compacts." Relators concede that there are no disputed issues of fact for trial and that their first assignment presents only a legal question. We review the trial court's determination on the legal issues and its resultant summary judgment rulings for legal error. *Doyle v. City of Medford*, 256 Or App 625, 632, 303 P3d 346, *rev allowed*, 354 Or 386 (2013). Contrary to relators' contentions, we conclude that ORS 190.110, which addresses agreements by the state and local governments with American Indian tribes, provides the Governor with statutory authority to enter into a variety of agreements on behalf of the state, including the tribal-state gaming compact at issue in this case.

We begin with the text of ORS 190.110, which provides, in part:

"(1)   In performing a duty imposed upon it, in exercising a power conferred upon it or in administering a policy or program delegated to it, a unit of local government or a state agency of this state may cooperate for any lawful purpose, by agreement or otherwise, with * * * an American Indian tribe. * * *

"(2)   The power conferred by subsection (1) of this section to enter into an agreement with an American Indian tribe * * * extends to any unit of local government or state agency that is not otherwise expressly authorized to enter into an agreement with an American Indian tribe * * *.

"(3)   With regard to an American Indian tribe, the power described in subsections (1) and (2) of this section includes the power of the Governor or the designee of the Governor to enter into agreements to ensure that the state * * * does not interfere with or infringe on the exercise of any right or privilege of an American Indian tribe * * * held or granted under any federal * * * statute * * *."

The authority expressly delineated in ORS 190.110 authorizes the Governor, in "performing a duty," "exercising a power," or "administering a policy or program," to cooperate for "any lawful purpose" with an American Indian tribe and to enter into agreements in a broad range of circumstances, including when the agreement will ensure that the state "does not interfere with or infringe on" a tribe's right or privilege under any federal statute.

Despite that grant of general authority, relators proffer several text-based arguments that ORS 190.110 does not authorize the Governor to execute a tribal-state gaming compact. They first note that ORS 190.110 does not specifically mention tribal-state compacts under IGRA. As relators acknowledge, however, the enactment of ORS 190.110 predates the 1988 enactment of IGRA. We do not find persuasive relators' suggestion that the legislature's omission of one specific federal statute under which Indian tribes have rights and privileges ought to bear significant weight in the textual analysis of ORS 190.110, which is broadly written and which contains no reference to any specific federal statutes. As *amici curiae* correctly note, many statutes are written in general terms so as to apply to new activity that may arise after passage. Relators' first textual argument also falters in the face of legislative history concerning ORS 190.110(3), as we later discuss.

Relators next argue that the Governor was not "administering a policy" or "performing a duty" that was "imposed" in accordance with ORS 190.110(1). We need not consider those arguments, though, because the statute also permits the Governor to cooperate with the Tribes and to enter into an agreement with them "in exercising a power" conferred on him. Those three bases in ORS 190.110(1) for intergovernmental cooperation are disjunctive, with any one of the three being sufficient. Relators have not made—and cannot make—an argument that the Governor lacked a "power" conferred on him to enter into the compact.

Such an argument is foreclosed by ORS 190.110(3), which specifically states that "the power described" in ORS 190.110(1) "includes the power of the Governor * * * to enter

into agreements to ensure that the state * * * does not interfere with or infringe on the exercise of any right or privilege of an American Indian tribe" that is secured under any federal statute. Without a doubt, IGRA provides rights or privileges to the Tribes with respect to gaming on Indian lands,[4] and the agreement at issue is a tribal-state compact that allows the Tribes to exercise those rights or privileges under IGRA. Although relators assert an argument that the Tribes had no right or privilege to exercise (and the state therefore could not interfere with or infringe it) because the Governor could refuse to engage in good-faith negotiations under IGRA, the Tribes, the state, and *amici curiae* correctly observe that IGRA provides a federal remedy should a state refuse to negotiate in good faith with an Indian tribe concerning the terms under which gaming will occur on Indian lands. That remedy, federally imposed terms for gaming operations on Indian lands within the state, *see* 25 USC § 2710(d)(7)(B)(vii) (allowing the Secretary of the Interior to prescribe procedures under which class III gaming may be conducted on Indian lands), does not make a tribe's right to conduct gaming on its lands any less of a right.[5] To the contrary, Congress provided a mechanism to ensure that Indian tribes could exercise their rights, despite any state opposition to gaming on Indian lands. Moreover, even were there any lingering doubt, we must construe the extent of the Governor's authority to sign an agreement with a tribe under the terms of ORS 190.110(3) broadly, because the legislature mandated that the provisions of ORS 190.110 "be liberally construed." ORS 190.007. Thus, we conclude that, by its own terms, ORS 190.110(3) confers a "power" on the Governor under ORS 190.110(1) to enter into a tribal-state compact under IGRA.

---

[4] Relators do not dispute that Oregon allows various class III gaming activities. For example, Oregon allows betting on horse and greyhound races, *see generally* ORS ch 462 (regarding animal racing); Oregon has a state lottery, Or Const, Art XV, § 4; and Oregon allows charitable, fraternal, and religious organizations to engage in gaming for fundraising within certain limitations, including bingo, lotto, raffles, and Monte Carlo events, including the playing of casino-style games such as roulette, blackjack, various forms of poker and other card games, craps, wheel of fortune, and baccarat, ORS 167.117 and ORS 167.118.

[5] The Tribes, the state, and *amici curiae* also take issue with relators' assertions regarding the historical circumstances of permissible Indian gaming regulation by Oregon before the enactment of IGRA. We need not and do not decide those issues.

Our review of legislative history in the determination of the legislature's intent, *see State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (describing rules of statutory construction), buttresses our reading of ORS 190.110. What is now subsection (3) of ORS 190.110 was added during the 1985 legislative session.[6] Or Laws 1985, ch 267, § 1. An attorney for the Confederated Tribes of Siletz Indians, LeRoy Wilder, testified in support of the legislation. Tape Recording, Senate Committee on Government Operations and Elections Committee, SB 159, Apr 1, 1985, Tape 58, Side A (statement of LeRoy Wilder). Wilder explained that Indian tribes had a right to engage in gaming activities free from state regulation and that passage of Senate Bill (SB) 159 would allow the Governor to address concerns that the state might have regarding gaming activities on tribal lands. *Id.* Thus, despite the fact that *Cabazon Band* had not yet been decided and IGRA was not yet enacted, the legislature in 1985 understood that the amendment adding ORS 190.110(3) could be used to address, at least in part, tribal-state agreements regarding gaming on Indian lands.[7] We accordingly reject relators' argument that the Governor acted *ultra vires* (without authority), and affirm the trial court's conclusion that ORS 190.110 permitted the Governor to enter into the compact with the Tribes.

We now turn to relators' second contention that, even if ORS 190.110 provided the Governor with statutory authority to enter into the tribal-state gaming compact, the statute violates what is now numbered as Article XV, section 4(10), of the Oregon Constitution. That provision states: "The Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon." In relators' view, Article XV, section 4(10), prohibits all casinos within the geographic borders of Oregon,

---

[6] The 1985 addition used the term "Executive Department" instead of "Governor." The legislature amended the statute to use "Governor" in 1999. Or Laws 1999, ch 948, § 3.

[7] Wilder's view of the law governing tribal rights to engage in gaming on Indian lands would have been confirmed by a review of the case law at that time. *See generally* Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 Ariz St L J 99, 109-124 (Spring 2010) (describing growing Indian tribal gaming enterprises, litigation, and congressional proposals in the early 1980s regarding tribal gaming in Indian country).

including those casinos that are located on tribal lands, and the Governor's entry into the compact under ORS 190.110 was unconstitutional. Through their second assignment of error, relators contend that the trial court erred in concluding that Article XV, section 4(10), was "voided" by virtue of IGRA's "preemption of state casino regulations under a validly signed compact." IGRA, they argue, does not preempt "state policy on gaming enshrined in state constitutions."

The Tribes and the state respond that ORS 190.110 is not unconstitutional and that Article XV, section 4(10), does not apply to gaming on Indian lands. They argue that, before IGRA's enactment, courts routinely concluded that a state that allowed any gaming, no matter how strictly regulated, could not interfere with gaming on Indian lands located within that state. *See, e.g., Cabazon Band,* 480 US at 209-11, 221. Citing numerous federal court decisions, *e.g., Mashantucket Pequot Tribe v. Conn.,* 913 F2d 1024 (2d Cir 1990), *cert den,* 499 US 975 (1991), they also argue that courts continue to hold that, if a state allows gaming, then the state's time, place, and manner restrictions on such gaming do not apply on Indian lands pursuant to IGRA. The Tribes and the state further argue that Article XV, section 4(10), is a state venue regulation—a restriction on where gaming may take place—that is preempted by federal law as it applies to Indian lands.

Thus, the issue the parties present to us is whether federal law or the prohibition of Article XV, section 4(10), on the legislature's authorization of casinos in Oregon applies to the Tribes' casino on the Hatch Tract. We agree with the Tribes and the state that (1) the Oregon Supreme Court has construed Article XV, section 4(10), as banning certain establishments, not games, and (2) the constitutional ban does not apply on Indian lands located within Oregon's borders.

In *Ecumenical Ministries of Oregon v. Oregon State Lottery Comm.,* 318 Or 551, 871 P2d 106 (1994), the Supreme Court rejected the plaintiffs' argument that certain statutes permitting video lottery games facially violated the constitutional ban on legislative authorization of casino operations in Oregon. The court, after examining the text and

context of the constitutional ban, held that Oregon voters had "intended to prohibit the operation of establishments whose dominant use or dominant purpose, or both, is for gambling." *Id.* at 562. The court held that the statutes were consistent with the constitution because the "use of video lottery game terminals does not, *per se*, make a place a casino." *Id.* at 564. Thus, Article XV, section 4(10), is not a ban on gambling, or even on all casino games; it is a prohibition against establishments in Oregon whose dominant use or purpose is for gambling. As such, Article XV, section 4(10), does not alter the rights of the Tribes under IGRA. *See, e.g., Mashantucket Pequot Tribe*, 913 F2d at 1031-32 (affirming summary judgment in favor of the tribe and an order that the state engage in good faith negotiations for a compact, given IGRA and the state's allowance of "Las Vegas nights" when conducted by a nonprofit organization).

IGRA specifically states that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 USC § 2701(5). And, as noted earlier, Congress intended that IGRA "preempt the field in the governance of gaming activities on Indian lands." The Supreme Court in *Cabazon Band* could not have been clearer when it stated that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States[.]" 480 US at 207 (internal quotation marks omitted). Thus, federal law, not state law, governs gaming on Indian lands.

The restriction on casinos in Article XV, section 4(10), applies to lands subject to state jurisdiction. We reject relators' contention at oral argument that all lands—even Indian tribal lands—located within the exterior boundaries of Oregon are subject to state jurisdiction for purposes of Article XV, section 4(10). *See, e.g., North Pacific Ins. Co. v. Switzler*, 143 Or App 223, 233-34, 924 P2d 839 (1996) (tribal members who lived on the Warm Springs Reservation did not "reside" in Oregon for purposes of personal jurisdiction because tribes occupy their own territory "in which the laws of Oregon have no force" except with assent of tribes or "in

conformity with treaties and acts of Congress" (internal quotation marks omitted)). Based on federal law governing gaming on Indian lands in IGRA and Oregon law allowing casino-style gaming to occur in Oregon, albeit under regulated and limited conditions, the Tribes are authorized to conduct class III gaming on the Hatch Tract, and ORS 190.110, allowing the Governor to negotiate and to enter into the gaming compact for class III gaming on the Hatch Tract, is not unconstitutional under Article XV, section 4(10).

2. *Authority under the Oregon Constitution*

The trial court also concluded that, independent of ORS 190.110, the Governor had authority under the Oregon Constitution to sign the compact. Thus, the parties make arguments concerning the Governor's constitutional authority. The state and the Tribes assert that the Governor could act under multiple provisions of the Oregon Constitution, namely, Article V, sections 10 and 13, and Article XV, section 3; relators, on the other hand, argue that the state and the Tribes read those provisions too broadly in this case because an act authorizing a casino in Oregon is a legislative function.

However, in light of our holding that the legislature authorized the Governor, under ORS 190.110, to enter into negotiations and to sign the gaming compact with the Tribes, we need not resolve that dispute. *See Leo v. Keisling*, 327 Or 556, 560, 964 P2d 1023 (1998) (in a challenge to the authority of the Secretary of State to act, stating that courts should not decide constitutional issues when an adequate subconstitutional basis for the decision exists). Thus, we do not reach the question of whether the Governor also had independent constitutional authority to enter into the compact with the Tribes.

We do, however, address another constitutional argument that relators make. Relators suggest that the legislature's statutory delegation of authority to the Governor in ORS 190.110—to cooperate and negotiate with Indian tribes in Oregon—is an unconstitutional abdication of its legislative function, in violation of the separation of powers contained

in Article III, section 1, of the Oregon Constitution.[8] We conclude that the Governor's signing of the compact pursuant to ORS 190.110 did not violate the principle of separation of powers.

There are "two inquiries to determine whether there is a separation of powers violation." *Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 28, 902 P2d 1143 (1995). The first is whether one branch of government has unduly burdened the action of another "in an area of responsibility or authority committed to that other department." *Id.* The second is whether one branch is "performing the functions committed to" another branch. *Id.* In conducting those inquiries, courts must bear in mind that the "roles that governmental actors are asked to play not infrequently interact in material ways" and that "the separation of powers does not require or intend an absolute separation" between the branches of government. *Id.* Finally, a violation of the separation of powers provision "may be found only if the problem is clear." *Id.*; *accord Smejkal v. DAS*, 239 Or App 553, 562, 246 P3d 1140 (2010), *rev den*, 351 Or 541 (2012).

We understand relators to rely on the argument that the Governor performed a function—setting policy on casino-style gaming—that is properly a function of the legislature. Relators generally contend that the Governor usurped legislative functions and "set casino gambling policy for the state." In response, the Tribes and the state argue that the legislature properly delegated authority to the Governor to act on behalf of the state in the context of controlling federal law regarding gaming on Indian lands and in accordance with gaming policies set by the legislature or the people directly through the initiative process. The Tribes and the state correctly point out that the Governor exercised his powers as authorized by the legislature in ORS 190.110 and pursuant to its legislatively set policies concerning intergovernmental cooperation. The Governor also acted pursuant to

---

[8] Article III, section 1, provides:

"The powers of the Government shall be divided into three seperate [*sic*] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

legislative allowance of casino-style gaming in Oregon, such as casino games in certain forms for charity events, which, in turn, permits Indian tribes to conduct such gaming on their lands under IGRA. We conclude that there is no clear separation-of-powers violation. Assuming that casino gambling policy is a legislative function, the legislature has set that policy in Oregon, allowing limited casino-style gaming. In accordance with governing federal law concerning the Tribes' rights to conduct gaming on their lands under IGRA, Oregon's legislative policy undergirded the Governor's entry into negotiations and the final gaming compact with the Tribes under ORS 190.110. The Governor did not violate the "underlying principle that separation of powers seeks to avoid the potential for concentration of separate powers" in one branch. *Rooney*, 322 Or at 28.

In summary, the Oregon legislature authorized the Governor to enter into agreements with tribes to ensure that the state does not infringe on tribal rights under federal laws, such as IGRA. The trial court correctly concluded that the Governor acted lawfully under ORS 190.110 in negotiating and entering into the tribal-state compact with the Tribes.

Affirmed.